# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2021AP1787-FT |

COMPLETE TITLE:

Allen Gahl Attorney in fact, on behalf of his principal, John J. Zingsheim,

Petitioner-Respondent-Petitioner,

v.

Aurora Health Care, Inc. d/b/a Aurora Medical Center - Summit,

Respondent-Appellant.

REVIEW OF DECISION OF THE COURT OF APPEALS
Reported at 403 Wis. 2d 539, 977 N.W.2d 756
PDC No: 2022 WI App 29 - Published

| | |
|---|---|
| OPINION FILED: | May 2, 2023 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | January 17, 2023 |

SOURCE OF APPEAL:
| | |
|---|---|
| COURT: | Circuit |
| COUNTY: | Waukesha |
| JUDGE: | Lloyd Carter |

JUSTICES:
ANN WALSH BRADLEY, J., delivered the majority opinion of the Court, in which ZIEGLER, C.J., ROGGENSACK, DALLET, HAGEDORN, and KAROFSKY, JJ., joined. REBECCA GRASSL BRADLEY, J., filed a dissenting opinion.
NOT PARTICIPATING:

ATTORNEYS:

For the petitioner-respondent-petitioner, there were briefs filed by *Karen L. Mueller* and *Amos Center for Justice & Liberty,* Chippewa Falls. There was an oral argument by *Karen L. Mueller.*

For the respondent-appellant, there was a brief filed by *Michael L. Johnson, Jason J. Franckowiak, Randall R. Guse,* and *Otjen Law Firm, S.C.,* Waukesha. There was an oral argument by *Jason J. Franckowiak.*

An amicus curiae brief was filed by *Ben Seel, Maher Mahmood, Patricia Epstein Putney, Melita M. Mullen,* and *Democracy Forward Foundation,* Washington D.C., and *Bell, Moore & Richter, S.C.,* Madison, for the American Medical Association and Wisconsin Medical Society.

An amicus curiae brief was filed by *Joseph W. Voiland* and *Veterans Liberty Law,* Cedarburg, for the Front Line COVID-19 Critical Care Alliance.

An amicus curiae brief was filed by *Andrew L. Schlafly, Rory E. O'Sullivan,* and *Rodli, Beskar, Neuhaus, Murray & Pletcher, S.C.,* River Falls, for the Association of American Physicians and Surgeons.

NOTICE

This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.

No. 2021AP1787-FT

(L.C. No. 2021CV1469)

STATE OF WISCONSIN      :      IN SUPREME COURT

**Allen Gahl Attorney in fact, on behalf of his principal, John J. Zingsheim,**

        Petitioner-Respondent-Petitioner,

  v.

**Aurora Health Care, Inc. d/b/a Aurora Medical Center - Summit,**

        Respondent-Appellant.

**FILED**

**MAY 2, 2023**

Sheila T. Reiff
Clerk of Supreme Court

---

ANN WALSH BRADLEY, J., delivered the majority opinion of the Court, in which ZIEGLER, C.J., ROGGENSACK, DALLET, HAGEDORN, and KAROFSKY, JJ., joined. REBECCA GRASSL BRADLEY, J., filed a dissenting opinion.

---

REVIEW of a decision of the Court of Appeals. *Affirmed.*

¶1 ANN WALSH BRADLEY, J. The petitioner, Allen Gahl, who holds power of attorney for his uncle, John Zingsheim, seeks review of a published decision of the court of appeals reversing the circuit court's issuance of an injunction. That injunction compelled Aurora Health Care, Inc., to administer a certain

medical treatment to Zingsheim.[1] The court of appeals determined that Gahl's claim must fail because he did not identify a source of law that (1) would give a patient or a patient's agent the right to force a health care provider to administer a treatment the health care provider concludes is below the standard of care, or (2) could compel Aurora to put an outside provider that would provide such care through its credentialing process.

¶2 Gahl contends that the court of appeals erred in reversing the circuit court's order. Specifically, he asserts that the circuit court has the authority to issue an injunction in the present circumstances, and that the injunction the circuit court issued was a proper exercise of its discretion.

¶3 Aurora disagrees. It argues that neither Gahl nor the circuit court identified a source of law that gives the circuit court the authority to compel a health care provider to administer a treatment that it believes is below the standard of care, or to compel a hospital to put a doctor that will do so through its credentialing process, such that Gahl would have a reasonable probability of success on the merits of his claim.

¶4 We conclude that the circuit court erroneously exercised its discretion by issuing an injunction without referencing any basis demonstrating that Gahl had a reasonable probability of success on the merits of some type of legal

---

[1] Gahl ex rel. Zingsheim v. Aurora Health Care, Inc., 2022 WI App 29, 403 Wis. 2d 539, 977 N.W.2d 756 (reversing order of the circuit court for Waukesha County, Lloyd V. Carter, Judge).

claim. Accordingly, we affirm the decision of the court of appeals.

I

¶5 Gahl holds health care power of attorney for his uncle, Zingsheim. At the time this case was filed, on October 7, 2021, Zingsheim was a patient in Aurora's care after testing positive for COVID-19.[2]

¶6 Through personal research, Gahl became aware of a drug called Ivermectin, which had been used as a purported treatment for COVID-19. He received a prescription for Ivermectin from Dr. Edward Hagen, a retired OB/GYN, who asserted that he "wrote the prescription based on a detailed discussion of Mr. Zingsheim's condition with Mr. Gahl," but never met with Zingsheim.

¶7 Aurora declined to effectuate Dr. Hagen's prescription for several reasons. According to Aurora's Chief Medical Officer, Ivermectin is "primarily used as an anti-parasitic in farm animals or administered to humans for treatment of certain parasites and scabies" and is not approved by the Food and Drug Administration as a treatment for COVID-19. The Chief Medical Officer further averred that a high dose of Ivermectin, such as

---

[2] According to the briefing, Zingsheim has recovered from his COVID-19 infection and was discharged by Aurora. No party makes any argument regarding mootness, and we will not develop any such argument for the parties. See Serv. Emps. Int'l Union, Loc. 1 v. Vos, 2020 WI 67, ¶24, 393 Wis. 2d 38, 946 N.W.2d 35 (explaining that "[w]e do not step out of our neutral role to develop or construct arguments for parties; it is up to them to make their case").

that prescribed by Dr. Hagen, "can be dangerous to humans and cause hypotension, ataxia, seizures, coma, and even death," and that accordingly "the use of ivermectin in the treatment of John Zingsheim's COVID-19 symptoms does not meet the standard of care for treatment."

¶8 Gahl subsequently filed a complaint in the circuit court, seeking declaratory and injunctive relief. Specifically, he sought an order requiring Aurora to administer Ivermectin to Zingsheim as prescribed by Dr. Hagen. Aurora opposed the requested relief.

¶9 The circuit court held an initial hearing on Gahl's petition on October 12, 2021. It heard arguments from both parties, but did not reach a decision. Instead, it sought additional information, stating:

> I feel that I do need more information[.] . . . This is not a decision that a Court makes based on emotion. That's not appropriate. So I need evidence, and . . . want more evidence from the treating doctors as to what is Mr. Zingsheim's current medical situation, what is his prognosis, . . . what is proposed to move forward. Is there something proposed to move forward, or is this a wait-and-see situation with no other alternatives?

> And I'd like some more information . . . to create that connection between this Dr. Hagen prescription and Mr. Zingsheim, because what I'm seeing here is just – there's a prescription written by somebody who really has very limited information about Mr. Zingsheim. . . . Other than Mr. Gahl, averring that he has communicated what the hospital has told him, again, there's no details of that. . . . It's Mr. Gahl's interpretation of what the hospital told him. And I don't know where that information comes from, so I don't know the viability of that information.

4

> But, you know, the ask here is for this Court to give a directive to some treating licensed medical doctors that they are telling me is contravening their responsibility to their patient. I mean, the divergent positions here couldn't be more extreme. And the consequences of action and nonaction are significant as well.

Accordingly, the circuit court gave the parties the opportunity to supplement the record.

¶10 Gahl and Aurora each submitted supplemental materials. Those filed by Gahl consisted of affidavits from Gahl himself, Dr. Hagen, and Dr. Pierre Kory.[3] Dr. Kory's affidavit was accompanied by a document indicating that it was Dr. Kory's testimony before the Homeland Security Committee regarding early treatment approaches to COVID-19.

¶11 Aurora filed a supplemental affidavit from its Chief Medical Officer. This supplemental affidavit updated the circuit court on Zingsheim's medical condition and the plan for his care and treatment.

¶12 Based on the supplemental information submitted, the circuit court acted quickly, and later in the day on October 12, signed an order to show cause Gahl had drafted and submitted. The order compelled Aurora to "immediately enforce Dr. Hagen's[] order and prescription to administer Ivermectin to their mutual patient, Mr. Zingsheim, and thereafter as further ordered by Mr. Gahl." There was no statutory basis or other legal foundation for the order set forth in its text.

---

[3] Dr. Kory's affidavit was neither dated nor notarized.

5

¶13 Almost immediately after the order issued, Aurora objected. Aurora referred to the circuit court's order as "extremely problematic." Specifically, it observed the following alleged shortcomings:

> I am not aware of any orders written by Dr. Hagen, but am aware of a prescription written by Dr. Hagen for Ivermectin 66mg to be taken once daily. The prescription does not indicate from where the Ivermectin is to be obtained or how the tablets are to be administered to a patient who is intubated and sedated. Finally, the Order provides that Aurora is to administer Ivermectin "as further ordered by Mr. Gahl." Mr. Gahl is not a healthcare provider.

> For the reasons above, it is my position as counsel for Aurora that my client is unable to comply with the terms of the Order as drafted.

¶14 The next day, on October 13, 2021, Aurora filed a petition for leave to appeal a nonfinal order with the court of appeals.[4] Additionally on that date, the circuit court held another hearing. At this hearing, the discussion revolved largely around Zingsheim's medical condition and the advantages and disadvantages of Ivermectin. After hearing from both sides, the circuit court maintained, but modified its previous order of the day before such that rather than ordering Aurora to administer the treatment, Gahl could identify a physician who could then be credentialed by Aurora:

> As it stands right now, this Court entered an order that is subject to a petition for leave to appeal to

---

[4] See Wis. Stat. § 808.03(2) (2019-20).

All subsequent references to the Wisconsin Statutes are to the 2019-20 version unless otherwise indicated.

6

the Court of Appeals, who have not weighed in on it. My intention is to maintain that order, but I am not going to engage in directing the hospital or individuals at the hospital . . . to administer this medication to Mr. Zingsheim. I think it's incumbent on the petitioner to supply a medical professional that's approved by the hospital for purposes of assisting this patient. But I don't think it's appropriate for this Court to engage in further orders to the hospital as to how this drug is administered.

They have, they being the hospital, have their rules of whom they admit to practice medicine there and how they do it, and I don't think – The Court is taking a significant step in this case by the order that's been entered. I think it's the petitioner's responsibility for not only supplying the prescription but supplying an individual that meets the approval of the hospital for administration. If Dr. Hagen doesn't pass muster, then the petitioner has to find somebody else. But I don't think this Court – This Court does not feel comfortable in making any further directives or orders to the hospital as to how that's to occur. I think that's a responsibility of the petitioner here and it's – That's how the Court views it.

Accordingly, the circuit court indicated its intent to clarify its previous order, agreeing that Gahl "is to supply or identify a physician that Aurora can then review and pass through its credentialing process. And once credentialed, that physician . . . will have permission to enter upon the premises and administer the Ivermection as ordered by Dr. Hagen[.]"

¶15 The day after this hearing, the court of appeals granted Aurora's petition for leave to appeal a nonfinal order. It additionally stayed the circuit court's order and all circuit court proceedings pending appeal. Gahl sought to bypass the court of appeals, which this court denied.[5]

---

[5] Gahl v. Aurora Health Care, Inc., No. 2021AP1787-FT, unpublished order (Wis. S. Ct. Oct. 25, 2021).

7

¶16 In a published opinion, the court of appeals reversed the circuit court's order. Gahl ex rel. Zingsheim v. Aurora Health Care, Inc., 2022 WI App 29, 403 Wis. 2d 539, 977 N.W.2d 756. It determined that "[Gahl] has failed to identify any source of Wisconsin law that gives a patient or a patient's agent the right to force a private health care provider to administer a particular treatment that the health care provider concludes is below the standard of care." Id., ¶1. Accordingly, "[b]ecause Gahl has failed to identify any law, claim, or recognized cause of action under Wisconsin law by which a patient may compel a health care professional to administer a course of treatment contrary to that medical professional's judgment, the court erroneously exercised its discretion in granting Gahl injunctive relief." Id. The court of appeals further concluded that the circuit court "had no legal authority to compel Aurora to credential an outside provider to provide care that is below the standard of care." Id., ¶64. Gahl petitioned for this court's review.

II

¶17 We are called upon to review the court of appeals' determination that the circuit court erroneously exercised its discretion in the issuance of a temporary injunction. A circuit court may issue a temporary injunction if four criteria are fulfilled: (1) the movant is likely to suffer irreparable harm if an injunction is not issued, (2) the movant has no other adequate remedy at law, (3) an injunction is necessary to preserve the status quo, and (4) the movant has a reasonable

8

probability of success on the merits.  Serv. Emps. Int'l Union, Loc. 1 v. Vos, 2020 WI 67, ¶93, 393 Wis. 2d 38, 946 N.W.2d 35.

¶18  The issuance of a temporary injunction is reviewed for an erroneous exercise of discretion.  Id.  We will sustain a discretionary decision as long as the circuit court examines the relevant facts, applies a proper standard of law, and, using a demonstrated rational process, reaches a conclusion that a reasonable judge could reach.  Indus. Roofing Servs., Inc. v. Marquardt, 2007 WI 19, ¶41, 299 Wis. 2d 81, 726 N.W.2d 898.

III

¶19  We begin by observing the limited nature of our review and emphasize that this case is not about the efficacy of Ivermectin as a treatment for COVID-19.  Rather, it is about whether the circuit court erroneously exercised its discretion by issuing the subject temporary injunction.

¶20  Gahl raises three arguments in this court in an attempt to demonstrate that the court of appeals erred and that in fact the circuit court had the authority to issue a temporary injunction.  First, he contends that the power of attorney statute, Wis. Stat. § 155.30(1), provides authority to issue the subject injunction.  Second, Gahl asserts that the circuit court has inherent authority to issue such an injunction.  Finally, he advances that the circuit court may issue the injunction in question under a theory of implied contract between Zingsheim and Aurora.  Aurora disputes each of these bases.

¶21  We need not address in depth any of Gahl's arguments because we do not know on what basis the circuit court issued

9

the injunction.[6] The circuit court cited no law in either its written order or its oral ruling, as Gahl conceded at oral argument before this court.[7] This in itself constitutes an erroneous exercise of discretion.

¶22 "Discretion is not synonymous with decision-making." McCleary v. State, 49 Wis. 2d 263, 277, 182 N.W.2d 512 (1971). Instead, "[d]iscretion contemplates a process of reasoning with

---

[6] We additionally observe that Gahl did not clearly raise these three arguments before the circuit court. Because we do not reach the merits of these arguments, we need not determine whether they are forfeited. See State v. Wilson, 2017 WI 63, ¶51 n.7, 376 Wis. 2d 92, 896 N.W.2d 682 (explaining that "[g]enerally, issues not raised or considered by the circuit court will not be considered for the first time on appeal"). At oral argument before this court, Gahl's counsel asserted the belief that the circuit court based its order on its inherent authority, but there is nothing in the record to support such an assertion, and no inherent authority argument was clearly articulated before the circuit court.

[7] At oral argument before this court, Gahl's counsel engaged in the following colloquy with the court:

> THE COURT: One of the requirements in order to issue a temporary injunction needs to be a reasonable likelihood of success on the merits. The merits has to be some legal authority for a court to intervene and issue an order mandating some action. The trial court, in my reading, did not cite any actual law to support its order. . . . The court of appeals rested its decision largely on that grounds. Even the dissent didn't point to any actual law that was cited . . . or at least relied upon to show why there is a reasonable likelihood of success on the merits. So just on the reasonable likelihood of success on the merits, what law was cited by the trial court to give it authority for it to issue this order?

> COUNSEL: The trial court did not identify a specific law.

a rational and explainable basis." State ex rel. Payton v. Kolb, 135 Wis. 2d 202, 205-06, 400 N.W.2d 285 (Ct. App. 1986). It is "more than a choice between alternatives without giving the rationale or reason behind the choice." Reidinger v. Optometry Examining Bd., 81 Wis. 2d 292, 297, 260 N.W.2d 270 (1977). "This process must depend on facts that are of record or that are reasonably derived by inference from the record and a conclusion based on a logical rationale founded upon proper legal standards." McCleary, 49 Wis. 2d at 277.

¶23 A circuit court erroneously exercises its discretion in the context of a temporary injunction when it "fails to consider and make a record of the factors relevant to its determination." Sch. Dist. of Slinger v. Wis. Interscholastic Athletic Ass'n, 210 Wis. 2d 365, 370, 563 N.W.2d 585 (Ct. App. 1997). Further, whether the party seeking an injunction has a reasonable probability of success on the merits in part turns on whether the moving party has stated a claim entitling it to relief. Id. at 374; see Wis. Stat. § 813.02(1)(a).

¶24 Although the circuit court acknowledged the four factors that must be fulfilled in order for a temporary injunction to be granted, it did not engage in any analysis of those factors. We base our determination here on its lack of analysis of Gahl's reasonable probability of success on the merits. Indeed, from a review of the circuit court's order, we do not know upon what legal basis it premised its authority to issue the injunction in the first instance. In other words, we do not know what viable legal claim the circuit court thought

11

Gahl had presented. Without identifying the legal basis it accepted, the circuit court cannot support the conclusion that Gahl has demonstrated a reasonable probability of success on the merits.

¶25 The circuit court's written order granting Gahl relief does not cite any statute, case, or other source of law as a foundation allowing for its issuance. Although the circuit court later clarified its intent in oral comments, those oral comments likewise did not identify any law on which the order was premised. Absent any citation to law establishing a legal basis for the order, we cannot determine that the circuit court employed the reasoning process our precedent demands.

¶26 In exercising its discretion, there are no "magic words" the circuit court must utter or any precise level of specificity that is required. But the record must make clear that the circuit court examined the relevant facts, applied a proper standard of law, and, using a demonstrated rational process, reached a conclusion that a reasonable judge could reach. See Indus. Roofing Servs., 299 Wis. 2d 81, ¶41. Here, the record is lacking in this respect.

¶27 The circuit court heard legal argument and at one point stated that is "has a significant respect for an individual's right to choose their treatment." However, such a stray reference does not equate to a legal analysis of the probability of success on the merits of Gahl's legal claim. The circuit court did not tie such "respect" to any legal analysis

12

or indicate how it could serve as a basis for the declaratory and injunctive relief Gahl sought.

¶28 We therefore conclude that the circuit court erroneously exercised its discretion by issuing an injunction without referencing any basis demonstrating that Gahl had a reasonable probability of success on the merits of some type of legal claim. Accordingly, we affirm the decision of the court of appeals.

*By the Court.*—The decision of the court of appeals is affirmed.

¶29 REBECCA GRASSL BRADLEY, J. *(dissenting).*

> The right of liberty is a natural right and it resides in the person, because he is a person. It is his self-determination with regard to fulfilling his natural final goal without interference. . . . It follows then that for the fulfillment of his destiny, man must be free and it is the duty of the State to secure and protect that freedom to enable the person to achieve his destiny.

Thomas J. Brogan, The Natural Law and the Right to Liberty, in 4 University of Notre Dame Natural Law Institute Proceedings 23, 29 (1951).

¶30 The first operative provision of the Wisconsin Constitution recognizes "[a]ll people" have certain "inherent rights" and the State of Wisconsin was founded by the people for the sole purpose of securing these rights. See Wis. Const. art. I, § 1. See generally Porter v. State, 2018 WI 79, ¶52, 382 Wis. 2d 697, 913 N.W.2d 842 (Rebecca Grassl Bradley & Kelly, JJ., dissenting) (explaining "[t]oo much dignity cannot well be given" to this provision (quoting State v. Redmon, 134 Wis. 89, 101, 114 N.W.2d 137 (1907))). Under the Wisconsin Constitution, the "just powers" of the government derive "from the consent of the governed," a consent explicitly premised on the State using these powers to secure the people's rights. Wis. Const. art. I, § 1. The Wisconsin Constitution exists not only to protect the people from an overreaching government but to empower the people's government to protect their individual freedom from non-state actors. See generally Jacobs v. Major, 139

Wis. 2d 492, 535, 407 N.W.2d 832 (1987) (Abrahamson, J., concurring/dissenting).

¶31 In this case, the circuit court used its equitable power to craft a narrow remedy, ensuring a non-state actor could not override the decision-making autonomy of a Wisconsin citizen to whom the non-state actor owed a duty of care.[1] See Immanuel Kant, Groundwork for the Metaphysics of Morals 34 (Jonathan Bennett ed., amend. 2008) (1785) (calling decision-making autonomy "the basis for the dignity of human nature"). John Zingsheim contracted COVID-19——a serious virus that has threatened the world.[2] He became so sick that he lay comatose in a privately-owned hospital, Aurora Medical Center-Summit——his life sustained by a feeding tube and ventilator. In a sense, he was a prisoner of circumstance: unable to be safely moved, he had no practical ability to exercise his natural right to seek treatment elsewhere. See, e.g., Martin ex rel. Scoptur v. Richards, 192 Wis. 2d 156, 172, 531 N.W.2d 70 (1995) (noting "every human being has a right to make his . . . own medical decisions"); 1 T. Rutherforth, Institutes of Natural Law 146 (1754) ("By liberty we mean the power, which a man has to act as

---

[1] The Honorable Lloyd V. Carter, Waukesha County Circuit Court, presided.

[2] As of mid-April 2023, the Wisconsin Department of Health Services has confirmed 16,523 people in this state have died while sick or probably sick with COVID-19. COVID-19: Wisconsin Deaths, Wis. Dep't Health Servs. (last updated Apr. 14, 2023), https://dhs.wisconsin.gov/covid-19/deaths.htm#number%20deaths. The World Health Organization (WHO) estimates nearly 7 million people have died of COVID-19. WHO Coronavirus (COVID-19) Dashboard, WHO (last updated Apr. 12, 2023), https://covid19.who.int/.

he thinks fit, where no law restrains him; it may therefore be called a man[']s right over his own actions."). Rather than allow Aurora to dictate Zingsheim's treatment, the court temporarily enjoined Aurora.

¶32 The circuit court was cautious in crafting its temporary injunction not to favor Zingsheim's natural right at Aurora's expense. The court merely ordered that Gahl could propose a doctor and that Aurora had to put this doctor through its credentialing process without undue delay. The court clarified the proposed doctor was not entitled to any special treatment. If the proposed doctor satisfied Aurora's standard criteria, Aurora was required to credential him but only for the limited purpose of administering ivermectin to Zingsheim. The court also required Gahl to sign a hold-harmless agreement to limit Aurora's exposure to liability. With this remedy, the court ensured no one would have to violate the dictates of his conscience. See generally City of Milwaukee v. Burnette, 2001 WI App 258, ¶10, 248 Wis. 2d 820, 637 N.W.2d 447 ("An injunction may be no more broad than is 'equitably necessary.'" (quoting State v. Seigel, 163 Wis. 2d 871, 890, 472 N.W.2d 584 (Ct. App. 1991))).

¶33 On review, this court is presented with a single issue: Whether the circuit court properly exercised its discretion in entering an order granting temporary injunctive relief. See Gahl ex rel. Zingsheim v. Aurora Health Care, Inc., 2022 WI App 29, ¶66, 403 Wis. 2d 539, 977 N.W.2d 756 (Grogan, J., dissenting). It did.

3

¶34 The resolution of this issue is governed by the "highly deferential" standard of review. See Prince Corp. v. Vandenberg, 2016 WI 49, ¶16, 369 Wis. 2d 387, 882 N.W.2d 371 (quoting Klawitter v. Klawitter, 2001 WI App 16, ¶8, 240 Wis. 2d 685, 623 N.W.2d 169). The circuit court properly exercised its discretion by considering the relevant facts and applying the correct legal standard, ultimately reaching a reasonable conclusion. Gahl, 403 Wis. 2d 539, ¶90. Although the court's analysis could have been more meticulous, this court has never required the detailed explanation the majority now demands. Additionally, "[r]egardless of the extent of the . . . [circuit] court's reasoning, [a reviewing court] will uphold a discretionary decision if there are facts in the record which would support the . . . court's decision had it fully exercised its discretion." State v. Hurley, 2015 WI 35, ¶29, 361 Wis. 2d 529, 861 N.W.2d 174 (quoting State v. Hunt, 2003 WI 81, ¶52, 263 Wis. 2d 1, 666 N.W.2d 771) (third modification in the original).

¶35 As three justices in the majority lamented in a case last term:

> Could the circuit court have more clearly articulated its factual findings and legal conclusions? Sure. However, when we review discretionary decisions, we do not require a perfectly polished transcript or magic words. Rather we "look for reasons to sustain the . . . [circuit] court's discretionary decision," reversing "if and only if the record does not reflect a reasonable basis for the determination or a statement of the relevant facts or reasons motivating the determination is not carefully delineated in the record."

4

State v. X.S., 2022 WI 49, ¶91, 402 Wis. 2d 481, 976 N.W.2d 425 (Hagedorn, J., dissenting) (quoting J.A.L. v. State, 162 Wis. 2d 940, 961, 471 N.W.2d 493 (1991)).

¶36 If the majority applied the correct standard of review, it would be forced to uphold the circuit court's decision. As Judge Shelley A. Grogan, who was on the panel at the court of appeals, wrote in dissent, "it is clear the . . . decision was reasoned and based on the record and applicable law." Gahl, 403 Wis. 2d 539, ¶83 (citing Diamondback Funding, LLC v. Chili's of Wis., Inc., 2004 WI App 161, ¶6, 276 Wis. 2d 81, 687 N.W.2d 89). Because the majority raises the review standard and now deems the expression of the substance of law insufficient to sustain a discretionary decision, I dissent.

## I. BACKGROUND

¶37 The majority opinion provides a scant statement of the facts, which misleads through omission. For that reason, I provide a thorough overview of the case. See generally Becker v. Dane County, 2022 WI 63, ¶89, 403 Wis. 2d 424, 977 N.W.2d 390 (Rebecca Grassl Bradley, J., dissenting) ("It is . . . customary for any judicial opinion to relay the facts of the case[.]"), recons. mot. filed.

¶38 This tragedy started when Zingsheim contracted COVID-19 in September 2021. His condition deteriorated rapidly. Zingsheim began receiving treatment at an Aurora hospital where his condition worsened. He was placed in the intensive care unit. He was then transferred to Aurora Summit and was on "full intubation ventilation," which the petition for relief describes

as "ventilation treatment that requires full sedation and restraints and which involves an extreme risk of decline and death." While such ventilation can be life-sustaining, it can also damage the lungs. In fact, counsel for Zingsheim's adult nephew, Allen Gahl, who held the health care power of attorney (HCPOA), informed the circuit court the "pressure" that ventilation places on the lungs is "unnatural[.]" The high pressure setting on which Zingsheim was placed could cause semi-permanent damage by "blow[ing] holes in . . . lungs" and "scar[ring] the tissues[.]" While at Aurora Summit, Zingsheim developed "perforated lungs," which, according to Gahl's counsel, caused bleeding. According to Aurora, Zingsheim had "[a]cute respiratory failure with hypoxia" among other sobering health concerns at that point. In summary, Zingsheim, a sixty-year-old man, was on death's doorstep.

¶39 Aurora administered to Zingsheim a cocktail of drugs including steroids, blood thinners, antibiotics, and sedatives, none of which improved his condition. Remdesivir was the only drug Aurora provided Zingsheim that was specifically for treating COVID-19, as opposed to his symptoms. Remdesivir was approved by the Food & Drug Administration (FDA) for treating COVID-19, but its use was controversial.[3] After two days on

---

[3] Gahl argued before the circuit court that WHO "recommends against the use of [r]emdesivir because it has severe effect[s]. . . . It has severe effect[s] on people's kidneys." Expanding on this point, an amicus curiae notes that WHO had issued a conditional recommendation against the use of remdesivir. WHO Recommends Against the Use of Remdesivir in COVID-19 Patients, WHO (Nov. 20, 2020), https://www.who.int/news-room/feature-stories/detail/who-recommends-against-the-use-of-remdesivir-in-covid-19-patients#:-

remdesivir, Zingsheim's family demanded Aurora stop administering it, worried it may cause severe side effects. Aurora responded that only palliative care was available. As the circuit court seemed to characterize the situation, Aurora adopted a "wait-and-see" approach——wait and see if Zingsheim died or got better.

¶40 Gahl became "fear[ful]" that Zingsheim would "not survive." He averred, "[i]t is . . . now common knowledge that . . . [COVID-19] patients on full ventilation and under heavy sedation and restraints have a poor prognosis"——a point the medical community later acknowledged to be true.

¶41 Gahl's fear caused him to begin researching COVID-19 treatments and specifically a drug called ivermectin. A summary of ivermectin clinical trials, attached as an exhibit to the petition for relief, explains that ivermectin "inhibits the replication of many viruses, including . . . [COVID-19]," much like remdesivir. A report in the record also notes ivermectin "protects against organ damage in animal models," having "potent anti-inflammatory and immune-modulating properties[.]" According to Gahl's counsel, before Zingsheim became comatose,

---

:text=WHO%20has%20issued%20a%20conditional. The recommendation was stated in quite strong terms: WHO recommended "against the use of remdesivir in hospitalized patients, regardless of disease severity, as there [wa]s . . . no evidence that remdesivir improve[d] survival and other outcomes in these patients." Id. In April 2022, well after the circuit court's decision, WHO began to "suggest[] the use of remdesivir in mild or moderate COVID-19 patients who are at high risk of hospitalization." Id.

7

he "told his two children and his nephew, . . . Gahl, that he wanted to take [ivermectin] so that he could live."

¶42 Like remdesivir, ivermectin is controversial. See generally Gahl v. Aurora Health Care, Inc., No. 2021AP1787-FT, unpublished order, at 2-3 (Wis. Oct. 25, 2022, as amended Oct. 28, 2022) (Roggensack, J., dissenting) ("I have concerns that Gahl is being treated differently because underlying the current motion is his effort to obtain treatment with [i]vermectin for . . . Zingsheim[.]").[4]  Exactly why is unclear and beyond the scope of this writing.  Ivermectin is approved by the FDA to treat humans suffering from parasitic infections.  Some doctors have also prescribed it to treat COVID-19, although the FDA has not approved it for that specific purpose.  In medical parlance, these doctors are prescribing ivermectin for an "off-label" use. The FDA explains "off-label" as follows:

> Unapproved use of an approved drug is often called "off-label" use.  This term can mean that the drug is:
>
> - Used for a disease or medical condition that it is not approved to treat, such as when a chemotherapy is approved to treat one type of cancer, but healthcare providers use it to treat a different type of cancer.
>
> - Given in a different way, such as when a drug is approved as a capsule, but it is given instead in an oral solution.
>
> - Given in a different dose, such as when a drug is approved at a dose of one tablet every day, but a patient is told by their healthcare provider to take two tablets every day.

---

[4] Four unpublished orders of this court are cited in this writing.  For transparency, a copy of each is provided in the appendix.

8

> If you and your healthcare provider decide to use an approved drug for an unapproved use to treat your disease or medical condition, remember that FDA has not determined that the drug is safe and effective for the unapproved use.

FDA, Understanding Unapproved Use Of Approved Drugs "Off Label" (Feb. 5, 2018), https://www.fda.gov/patients/learn-about-expanded-access-and-other-treatment-options/understanding-unapproved-use-approved-drugs-label#:~:text=Unapproved%20use%20of%20an%20approved,a%20different%20type%20of%20cancer. Off-label use might sound scary, but it is actually quite common. As Gahl explains in his opening brief, "[t]housands of 'off-label' prescription drugs are prescribed every day for use that the FDA has not 'approved' of in the United States." One amicus brief notes about 20 percent of all prescriptions are for an off-label use. The majority omits this context from its opinion while emphasizing ivermectin is "not approved by the . . . [FDA] as a treatment for COVID-19." Majority op., ¶7. Apparently for dramatic rhetorical effect, the majority even notes that ivermectin, which, to reiterate, is approved for humans, is also used to treat animals.[5] Id.

¶43 Gahl's research led him to conclude ivermectin could be an effective treatment for COVID-19. Various studies Gahl

---

[5] Even more absurdly, the court of appeals majority equated Gahl's concession that treating COVID-19 with ivermectin is an "off-label" use with an admission that ivermectin is below the standard of care. Gahl ex rel. Zingsheim v. Aurora Health Care, Inc., 2022 WI App 29, ¶33, 403 Wis. 2d 539, 977 N.W.2d 756 ("[T]hroughout his brief, Gahl effectively acknowledges that the proposed treatment is not within the accepted standard of care for COVID-19. He admits that using the proposed treatment for COVID-19 is not approved by the FDA, as it is an 'off-label use of the drug.'").

9

read strongly indicated ivermectin could help his uncle. For example, one study presented to the circuit court found COVID-19 patients in severe condition had a substantially lower chance of dying when treated with ivermectin.

¶44 In an effort to save his uncle, Gahl sought medical advice from a doctor unaffiliated with Aurora, Dr. Edward Hagen, M.D., who had experience with ivermectin. According to Dr. Hagen, he spoke with Gahl who conveyed to him "detailed information about his [u]ncle's condition." Dr. Hagen also averred he reviewed Zingsheim's eight-page medical history, which was in the record before the circuit court. Dr. Hagen then prescribed Zingsheim ivermectin.

¶45 Gahl requested that Aurora administer ivermectin as Dr. Hagen had prescribed, but Aurora refused. Curiously, Dr. James Holmberg, M.D., Aurora's Chief Medical Officer, averred, "[i]vermectin was requested by family" but not administered "per system policy." Gahl alleges corporate executives——not doctors——were making broad policies without knowledge about individual patients.

¶46 Gahl averred he could not "give up" on his uncle even if Aurora had. As Gahl explained, "[a]t this point, there [wa]s nothing . . . [Aurora could] do, or [was] will[ing to] do, for my uncle that [wa]s likely to improve his condition." Gahl sued Aurora on Zingsheim's behalf.

¶47 Gahl posited a number of legal theories in the petition for relief. Most pertinently, Gahl emphasized, "the hospital . . . has sole custody of the patient due to his poor

10

medical condition[.]" Consequently, Aurora's conduct was depriving Gahl of his "undisputed right under well-established law to make reasonable and lawful medical decisions" because he could not go elsewhere to receive treatment. As noted in the petition: "[W]hat dramatically changes the normal analysis of patient choice is that fact that the patient is essentially in hospital 'prison' due to his poor medical condition. He cannot go out into the medical marketplace to fulfill his preferences which is otherwise his right under state law[.]"

¶48 Gahl cited Zingsheim's "right to self-determination" under, among other legal sources, Article I, Section 1 of the Wisconsin Constitution, the informed consent statute, and the common law.[6] Among other theories, Gahl also argued that withholding ivermectin violated the patient-physician contract, the Hippocratic Oath, and Gahl's statutory right as the holder of the HCPOA. Gahl also argued that administering ivermectin was within the standard of care, noting, "the evidence in favor of . . . [ivermectin] is considerable, and the counterarguments against its use and efficacy are weak."

---

[6] Gahl cited the wrong informed consent statute, Wis. Stat. § 51.61(1)(fm) (2019-20). His point still stands. Compare § 51.61(1)(fm) (explaining a "patient," which is defined as a person receiving certain mental health or substance abuse treatment, has "the right to be informed of his . . . treatment and care and to participate in the planning of his . . . treatment and care"), with Wis. Stat. § 448.30 ("Any physician who treats a patient shall inform the patient about the availability of reasonable alternate medical modes of treatment and about the benefits and risks of these treatments.").

11

¶49 The majority inaccurately suggests Gahl may have forfeited several legal arguments by not advancing them before the circuit court. Specifically, the majority claims Gahl did not argue a contract theory or a HCPOA theory, but these assertions are untrue——even the court of appeals majority acknowledged these arguments were made. Compare id., ¶21 n.6, with Gahl, 403 Wis. 2d 539, ¶¶36-37 (majority op.) (noting Gahl did not forfeit his argument that Aurora had violated "an implied contractual duty based on the Hippocratic Oath" or his argument that Aurora violated the "statute concerning HCPOAs"), and ¶35 n.22 ("We have carefully scrutinized the petition [for relief] to discern Gahl's probable arguments supporting his claim that the court has authority to act in this case. The arguments Gahl set forth in his original petition are as follows: (1) failure to provide the treatment violated the 'Hippocratic Oath'; . . . (3) withholding treatment violates the HCPOA held by Gahl[.]"). The court of appeals majority also seemed to conclude that Gahl did not forfeit his argument that the circuit court had "legal and equitable authority"——which that majority labeled as "inherent power"——to impose the relief it did. Gahl, 403 Wis. 2d 539, ¶¶36-37, 47-48.

¶50 The majority suggests Gahl "sought an order requiring Aurora to administer [i]vermectin," which is partly true, but ultimately Gahl simply wanted ivermectin administered; he did not care by whom. See Majority op., ¶8. Gahl noted in the petition for relief that if the circuit court was not willing to

12

order Aurora to administer the drug, "other" or "different" relief would be acceptable.

¶51 Gahl explained in the petition for relief that he was willing to sign a hold-harmless agreement. The majority omits this fact among many others that do not fit its narrative. The court of appeals majority speculated an agreement might not "shield Aurora and its health care professionals from liability" in "future litigation." Gahl, 403 Wis. 2d 539, ¶58. Strangely, the court of appeals majority also complained that an agreement in this case would not resolve how other disputes, involving different patients, might be handled. Id. ("Although the plaintiff had offered to sign a release, 'the potential harm to defendants is broader than this one case, because a court directive in this matter could open the door for a flood of similar suits from other patients with COVID-19, not to mention other conditions, suing to obtain care that is contrary to hospital policies.'" (quoting Frey v. Trinity Health-Mich., No. 359446, unpublished slip op., 2021 WL 5871744 at *5 (Mich. Ct. App. Dec. 10, 2021) (per curiam))).

¶52 The circuit court initially rejected the petition for relief out-of-hand because it was filed without the exhibits mentioned in the petition. The court explained, "I think it highly inappropriate for this [c]ourt to set aside its obligations under the law and act in a vacuum without proper basis or knowledge." After the missing materials were filed, the court held a hearing on what its characterized as an "emergency medical injunctive relief petition." The court

13

emphasized the urgency presented by Gahl's assertions. It considered the situation "dire" and "felt it incumbent on the [c]ourt . . . to get this in as soon as possible to address [the issue.]" Nonetheless, the court recognized "there ha[d] to be a legal basis" for its decision, stating that it would "not [be] appropriate" to base its decision "on emotion" instead of evidence. The court also recognized it was a "layperson" in relation to medicine and accordingly was "relying on the record . . . generated . . . to make the evaluation and exercise the [c]ourt's discretion on the request." At the hearing, the circuit court heard lengthy arguments involving many exhibits. The transcript of the hearing spans 70 pages.

¶53 On the one hand, Gahl's counsel contended ivermectin was a viable treatment that could improve Zingsheim's condition. Although the circuit court was receptive to Gahl's arguments, it noted skepticism at times. For example, Gahl's counsel referenced various cases across the nation in which courts had ordered health care providers to administer ivermectin. Some of these decisions were provided as exhibits. The court questioned whether these decisions were factually on point. Specifically, the court told Gahl's counsel:

> The specific cases that you referenced by way of example, and you submitted some documents regarding those, my review, at least of the ones that were identified specifically, you referenced the 80-year-old woman, the Rochester, New York, situation. My understanding from what I reviewed was that there had already been administration of [i]vermectin, and those cases were for either reinstitute [sic] it or continuing it after a medical doctor who had a relationship with the patient had made a decision to prescribe it and then the hospital, for whatever

14

reason, decided to either not continue it or to terminate it. But those cases involved the situation where a licensed medical doctor with a patient -- a patient-doctor relationship with the individual had already made a prescription decision, and it seems facially different from what we have here.

The court ultimately viewed these cases as "anecdotal[.]"

¶54 On the other hand, Aurora argued that administering ivermectin would fall below the standard of care. Repeatedly during the hearing, Aurora analogized the administration of ivermectin to the administration of bleach; however, the court rejected the analogy: "we're not talking about putting bleach in somebody's veins here." The court also pushed back on Aurora's argument that Gahl was trying to change the "status quo":

> I have to interject a question here . . . . [W]e don't have -- And that's what's missing in the two doctors' affidavits. What is the ongoing medical protocol and treatment that's being pursued. I mean, if, in fact, . . . they're at the end of the line of their available treatments for . . . Zingsheim and they're saying, well, we put him on a ventilator and we're just going to, you know, see if he can fight this off without any further intervention, then the status quo is then, well, we'll just cross our fingers and hope for the best. And I don't mean to diminish their medical opinions, but I don't have anything in the record that says, well, what are we doing to treat this gentleman other than put him on a ventilator and hope for the best.

¶55 Toward the close of the hearing, the circuit court recited the correct legal standard; the majority does not dispute this. Specifically, the circuit court stated:

> The parties have touched on the elements that are before the [c]ourt on what amounts to a legal decision when considering a temporary injunction/restraining order. And it requires the moving party here, the petitioner, demonstrate that the movant is likely to

15

suffer irreparable harm if the temporary injunctive relief is not issued; also, secondly, that the movant has no other adequate remedy at law; thirdly, a temporary injunction is necessary to preserve at status quo; and, finally, the movant has a reasonable probability of success on the merits. That issue with those elements is put before the [c]ourt as a matter of exercising its discretion. . . . So that's the basis and the background legally that the [c]ourt has to utilize as a framework and in assessing the circumstances of this case.

This court has applied the same standard in numerous cases. See e.g., Waste Mgmt., Inc. v. Wis. Solid Waste Recycling Auth., 84 Wis. 2d 462, 465, 267 N.W.2d 659 (1978) (quoting Werner v. A. L. Grootemaat & Sons, Inc., 80 Wis. 2d 513, 519-20, 259 N.W.2d 310 (1977)).

¶56 After articulating the correct legal standard, the circuit court explained various factual considerations. It mentioned Zingsheim's serious condition and the competing evidence regarding whether ivermectin would be effective. It was also concerned with preserving Zingsheim's life, noting, "the petitioner has asserted that if this [c]ourt doesn't act, act now, act today, . . . Zingsheim is going to die." Critically, it also expressed "a significant respect for an individual's right to choose and choose their treatment." Even still, the court understood this right is not absolute——very few rights are.

¶57 The circuit court then found it lacked sufficient information to determine whether the temporary injunction requirements had been satisfied. It wanted more information about how Dr. Hagen had made his decision to prescribe ivermectin. More generally, it recognized that both Zingsheim's

16

condition and the viability of ivermectin as a treatment for COVID-19 were key considerations. As the court explained, without additional information on these matters, "it's very difficult . . . to assess what, in fact, we're dealing with other than relying on anecdotal representations today that [are] otherwise unsupported by competent medical expertise." The court ordered supplemental material be filed later that day.

¶58 While the circuit court was indicating it needed more information, Gahl's counsel tried to pass the burden of proof onto Aurora, arguing "respondents need to prove that . . . [i]vermectin is dangerous and does not work. And they can't do that." The court rejected such burden shifting, making clear it viewed this case as a neutral arbiter should. While Gahl had submitted some evidence, the court noted Aurora had submitted:

> two affidavits from treating physicians and doctors licensed in the State of Wisconsin that assert to this [c]ourt that . . . [ivermectin] is dangerous. That's the problem. . . . I've read the other materials that you submitted in support of the petition . . . . And that's great, but now I have two other doctors involved . . . say[ing] . . . Judge this is dangerous and we believe . . . that the use of [i]vermectin is more dangerous than efficacious.

The court continued, "we're in a court of law here today and there has to be a legal basis for this [c]ourt to make a determination."

¶59 The circuit court received dueling affidavits. Gahl filed an affidavit by Dr. Hagen, who averred he had discussed Zingsheim's condition with Gahl and reviewed Zinghseim's medical history. He opined that "based on the patient's

17

history, . . . the administration of [i]vermectin at the dosage indicated . . . [would give] the patient a realistic chance for improvement while presenting a low risk of side effects."  He also attested, "I have prescribed [i]vermectin in about 300 other cases with generally favorable results and no serious cases of side effects from the drug."[7]  Aurora filed an affidavit from Dr. Holmberg——his second in the case——which described Zingsheim's treatment plan.

¶60 The majority's misuse of affidavits reveals its misunderstanding regarding the standard of review.  The majority opinion largely ignores Dr. Hagen's affidavit and instead relies heavily on Dr. Holmberg's first even though the circuit court obviously gave Dr. Hagen's more weight——which, as the trier of fact, it had the discretion to do.  See Majority op., ¶7.  The majority also takes a not-so-subtle shot at Dr. Hagen by referring to him as a retired OB/GYN.  Id., ¶6.  Similarly, the court of appeals majority mentioned that Dr. Hagen was sanctioned about a decade ago by the Wisconsin Medical Examining Board for prescribing medication to an individual who was not his patient.  Gahl, 403 Wis. 2d 539, ¶8.  The circuit court was aware of these facts.  The court could have used this information to discount the information provided by Dr. Hagen, but it did not do so.  Under the proper standard of review, this

---

[7] Gahl also filed an unnotarized affidavit of another doctor, which cannot be considered.  Wis. Hosp. Ass'n v. Nat. Res. Bd., 156 Wis. 2d 688, 723 n.13, 457 N.W.2d 879 (Ct. App. 1990); see also Wis. Stat. § 887.01 (2019-20).

18

court is not the trier of fact and must defer to the circuit court's credibility determinations.

¶61 After reviewing the supplemental materials, the circuit court ordered Aurora to administer ivermectin to Zingsheim as prescribed. Instead of complying with the circuit court's order, Aurora instead wrote a letter to the court in which it claimed it was "unable to comply with the terms of the [o]rder as drafted" and asked the court for clarification. Aurora also filed a petition for leave to appeal the nonfinal order. Aurora did not seek relief pending appeal in the court of appeals.

¶62 The next day, the circuit court held a second hearing to consider Aurora's concerns. At this hearing, Aurora's counsel told the circuit court that Zingsheim tested negative for COVID-19 and asked whether that changed anything from the court's perspective. Gahl's counsel represented that ivermectin was "not solely for the issue of COVID. It's for COVID and the damages that come about as a result of COVID." The court accepted the representation of Gahl's counsel. It then orally modified its prior order.

¶63 The modified order required Aurora to allow a physician identified by Gahl, who met Aurora's standard credentialing criteria, to have access to Zingsheim to administer ivermectin.[8] The modified order did not require

---

[8] As one amicus curiae points out, the concern about Dr. Hagen having prescribed a medicine without an in-person examination is unwarranted given that a doctor willing to administer the drug would have to come to Zingsheim in person.

19

Aurora's medical staff to administer, or even to provide, ivermectin.

¶64 Contrary to the insinuation of the court of appeals majority, the circuit court did not require Aurora to credential any particular doctor. See id., ¶64. As the circuit court explained:

> I am not going to engage in directing the hospital or individuals at the hospital . . . to administer this medication to . . . Zingsheim. I think it's incumbent on the petitioner to supply a medical professional that's approved by the hospital for purposes of assisting this patient. But I don't think it's appropriate for this [c]ourt to engage in further orders to the hospital as to how this drug is administered.
>
> They have, they being the hospital, have their rules of whom they admit to practice medicine there and how they do it, and I don't think -- The [c]ourt is taking a significant step in this case by the order that's been entered. I think it's the petitioner's responsibility for not only supplying the prescription but supplying an individual that meets the approval of the hospital for administration.

The court stated it was "not going to step on . . . [Aurora's] toes" and it was giving "due deference" to Aurora's procedures. The court specifically declared it was "not going to start dictating to the hospital and start to change their policies of how they make their determination of who's appropriate to come into their facility and administer medication," considering such action "an overreach."

¶65 In particular, the circuit court emphasized that Aurora need not credential Dr. Hagen, noting:

> If Dr. Hagen doesn't pass muster, then the petitioner has to find somebody else. But I don't think this

20

[c]ourt -- This [c]ourt does not feel comfortable in making any further directives or orders to the hospital as to how that's to occur. I think that's a responsibility of the petitioner here and it's -- That's how the [c]ourt views.

While Aurora was required to not "engage in undue delay" in the credentialing process, it was not required to give the proposed doctor any special treatment.

¶66 Additionally, the circuit court's modified order required Gahl to sign a hold-harmless agreement, at Aurora's request and in light of Gahl stating in the petition for relief he would be willing to sign one. Despite these facts, the court of appeals majority actually relied on the existence of the agreement as support for its erroneous holding: "That the parties and the circuit court discussed a release of liability is further evidence that Gahl's requested relief would have forced Aurora to act outside the boundaries of the law and that his request was not grounded in any legal authority." Id., ¶58 n.34.

¶67 After the circuit court orally modified its order, Gahl and Aurora began to negotiate. According to the court of appeals majority, Aurora was "on the cusp of providing temporary credentials to an outside provider, subject to Gahl signing releases." Id., ¶26 n.19. The day after the oral modification, while negotiations were ongoing, the court of appeals granted Aurora's petition for leave to appeal a nonfinal order——before even receiving a response from Gahl. Worse still, the court of appeals, on its own motion and without any explanation, stayed the circuit court's oral ruling, even though it apparently did

21

not know the exact contents of that ruling. See Gahl v. Aurora Health Care, Inc., No. 2021AP1787, unpublished order, at 3 (Wis. Oct. 21, 2021) (Rebecca Grassl Bradley, J., dissenting). The court of appeals acted so hastily that the oral ruling had not been reduced to a signed written order. Gahl filed an emergency petition to bypass the court of appeals. In a 4-3 decision, this court denied that petition, leaving the stay entered by the court of appeals undisturbed.

¶68 Following the bypass denial, the court of appeals took seven months to decide this case despite its emergency nature. While the appeal was initiated on October 12, 2021, the court of appeals did not issue its opinion until May 25, 2022——225 days later. Gahl, 403 Wis. 2d 539, ¶72 n.4 (Grogan, J., dissenting). If the court of appeals decides to take a case with life or death consequences, it has a moral, if not legal, duty to decide it in a timely manner. Gahl, No. 2021AP1787, at 4 (Oct. 21, 2021) ("While appellate courts have all the luxury of time to ponder the law, . . . Zingsheim, fighting for his life, does not. Circuit courts are best equipped to make these sorts of frontline decisions, in which time is of the essence.").

¶69 The court of appeals majority reversed the modified order of the circuit court over the well-reasoned dissent of Judge Grogan, which this court's majority completely ignores.[9] The court of appeals majority held the circuit court erroneously

_____

[9] The court of appeals understood itself to be reviewing the circuit court's order as orally modified. Gahl, 403 Wis. 2d 539, ¶25 n.18. This court likewise reviews the modified order.

22

exercised its discretion because, in its view, Gahl, not the circuit court, "failed to identify any law, claim, or recognized cause of action under Wisconsin law by which a patient may compel a health care professional to administer a course of treatment contrary to that medical professional's judgment." Gahl, 403 Wis. 2d 539, ¶1 (majority op.). It "further [held] the [circuit] court had no legal authority to compel Aurora to credential an outside provider to provide care that is below the standard of care." Id., ¶64.

¶70 This holding presupposes that the administration of ivermectin actually falls below the standard of care. As Judge Grogan explained:

> By redefining "standard of care" to mean what the treating physician believes it to be, the majority effectively requires all courts going forward to simply accept the health care provider's belief as to the standard of care where a patient seeks an injunction based on a disagreement with the provider's course of action in providing care.

Id., ¶85 n.11 (Grogan, J., dissenting). Judge Grogan's dissent documented the existence of "legal authority to issue injunctive relief under these circumstances" and concluded the circuit court properly exercised its discretion. Id., ¶¶88, 90. Gahl petitioned this court for review, which this court granted.

## II. STANDARD OF REVIEW

¶71 Whether to grant a temporary injunction is within the circuit court's discretion. Milwaukee Deputy Sheriffs' Ass'n v. Milwaukee County, 2016 WI App 56, ¶20, 370 Wis. 2d 644, 883 N.W.2d 154 (citing State v. C. Spielvogel & Sons Excavating,

23

Inc., 193 Wis. 2d 464, 479, 535 N.W.2d 28 (Ct. App. 1995)). As already explained, the standard of review is highly deferential:

- An appellate court "may not substitute its discretion for that of the circuit court." State v. Rhodes, 2011 WI 73, ¶26, 336 Wis. 2d 64, 799 N.W.2d 850 (citing State v. McCall, 202 Wis. 2d 29, 42, 549 N.W.2d 418 (1996)).

- An "appellate court[] should 'look for reasons to sustain a . . . [circuit] court's discretionary decision.'" State v. Gutierrez, 2020 WI 52, ¶27, 391 Wis. 2d 799, 943 N.W.2d 870 (quoting State v. Wiskerchen, 2019 WI 1, ¶18, 385 Wis. 2d 120, 921 N.W.2d 730).

An appellate court must uphold a circuit court's discretionary decision if the circuit court applied the correct legal standard to the relevant facts and reached a reasonable conclusion. See Seigel, 163 Wis. 2d at 889 (citing Hartung v. Hartung, 102 Wis. 2d 58, 66, 306 N.W.2d 16 (1981)).

¶72 In fact, "[r]egardless of the extent of the . . . [circuit] court's reasoning, [a reviewing court] will uphold a discretionary decision if there are facts in the record which would support the trial court's decision had it fully exercised its discretion." Hurley, 361 Wis. 2d 529, ¶29 (quoting Hunt, 263 Wis. 2d 1, ¶52) (third modification in the original). If the appellate court is unsure whether the record can be so read, the proper remedy is to remand to the circuit court so that the circuit court can "articulate reasoning[.]" See X.S., 402 Wis. 2d 481, ¶58 n.1 (Ziegler, C.J., concurring) (citing Paschong v. Hollenbeck, 16 Wis. 2d 284, 286, 114 N.W.2d 438 (1962)).

24

¶73 A circuit court may issue a temporary injunction if the requirements of Wis. Stat. § 813.02(1)(a) (2019-20) are satisfied. Section 813.02(1)(a) states:

> When it appears from a party's pleading that the party is entitled to judgment and any part thereof consists in restraining some act, the commission or continuance of which during the litigation would injure the party, or when during the litigation it shall appear that a party is doing or threatens or is about to do, or is procuring or suffering some act to be done in violation of the rights of another party and tending to render the judgment ineffectual, a temporary injunction may be granted to restrain such act.

This court has generally required four elements:

- The party requesting relief is likely to suffer irreparable harm if a temporary injunction is not issued;

- A temporary injunction is necessary to maintain the status quo, thereby preventing the irreparable harm;

- The moving party has no other adequate remedy; and

- The party has a reasonable probability of success on the merits.

Waste Mgmt., Inc., 84 Wis. 2d at 465 (quoting Werner, 80 Wis. 2d at 519).

### III. ANALYSIS

¶74 In this case, the circuit court properly exercised its discretion. The majority seems to take issue with the circuit court's analysis regarding only one of the four prerequisites for injunctive relief: the reasonable probability of success. The majority, however, also states, "[the circuit court] did not engage in any analysis" of any requirement. Majority op., ¶24. Similarly, the court of appeals majority opinion, which the majority of this court affirms, seriously misunderstood the

25

elements. A majority of this court leaves these errors uncorrected, and therefore they are likely to feature in future cases. Although the majority seems to affirm the decision on a narrow basis, it does not expressly—or even impliedly—signal the opinion below loses its precedential value. Consequently, the court of appeals will understand itself to be bound by that opinion. See State v. Schmidt, 2016 WI App 45, ¶48 n.11, 370 Wis. 2d 139, 884 N.W.2d 510 (citing Blum v. 1st Auto & Cas. Ins., 2010 WI 78, ¶44, 326 Wis. 2d 729, 786 N.W.2d 78). See generally Wis. Mfrs. & Com. v. Evers, 2023 WI 5, ¶2, 405 Wis. 2d 478, 984 N.W.2d 402 (per curiam) (noting that while this court has not addressed the issue directly, when this court affirms a published opinion of the court of appeals, on different grounds but without suggesting the rationale of the court of appeals was incorrect, the court of appeals opinion may remain binding precedent). Accordingly, a brief overview of the circuit court's analysis regarding the other requirements is in order first.

### A. The Other Requirements

¶75 Judge Grogan's dissent accurately describes the circuit court's analysis of the requirements: "The circuit court . . . recognized that Zingsheim's medical condition, which undoubtedly relates to multiple injunction factors, created an urgent, if not dire, situation." Gahl, 403 Wis. 2d 539, ¶83. Zingsheim's "precarious medical condition" unquestionably pertained to "irreparable harm (death)" and the "status quo

26

(life)[.]" Id. "Additionally, given . . . the finality of death, there was no other adequate remedy at law[.]" Id.

¶76 The court of appeals' discussion of irreparable harm in the majority opinion focused on the wrong party. That majority discussed "several concerns" raised by Aurora about the "irreparable harm" Aurora could experience from the temporary injunction. Id., ¶¶57-59 (majority op.). Aurora claimed providing treatment below what it perceived to be the standard of care could impact the licensing of its doctors and nurses and expose Aurora to civil liability despite the hold-harmless agreement. Id. Analyzing the potential harm to Aurora was improper. Wisconsin Stat. § 813.02(1)(a) provides, in relevant, part: "When it appears from a party's pleading that the party is entitled to judgment and any part thereof consists in restraining some act, the commission or continuance of which during the litigation would injure the party . . . ." (Emphasis added.) As indicated by the plain language of § 813.02(1)(a), the irreparable harm requirement concerns injury to "the party asking for relief." See 43A C.J.S. Injunctions § 68 (updated Mar. 2023). Accordingly, the court of appeals majority should have evaluated whether Aurora's conduct would "violate a right . . . and injure [Zingsheim]" in a way that Zingsheim's injury would be "irreparable." Pure Milk Prods. Co-op. v. Nat'l Farmers Org., 90 Wis. 2d 781, 800, 280 N.W.2d 691 (1979) (citations omitted).

¶77 The court of appeals majority mischaracterized the modified order. The modified order did not compel Aurora to

27

administer the drug, so Aurora's licensing concerns are unfounded. Similarly, the standard of review does not permit the court of appeals to speculate the hold-harmless agreement might be found invalid. The circuit court at least implicitly found the agreement sufficient to protect Aurora, and the court of appeals majority lacked competence to question that finding.

¶78 The court of appeals majority also suggested the circuit court did not understand the status quo, a claim belied by the full record. Gahl, 403 Wis. 2d 539, ¶¶60-61. That majority asserted:

> Here, . . . the circuit court's order changed the status quo by ordering Aurora to begin providing the proposed treatment to the patient. . . .
>
> The circuit court did not address this factor directly, but it is of paramount importance given the concerns Aurora provided to the court and the affirmative relief ordered. The status quo before the litigation was that Aurora was able to exercise its medical judgment as to patients in the hospital within the bounds of its standard of care.

Id. The court of appeals again misdirected its analysis, erroneously focusing on the status quo from Aurora's perspective rather than the party seeking injunctive relief.

¶79 Under this court's precedent, the status quo requirement is closely related to the irreparable harm requirement. As this court explained more than a century ago:

> Just where the truth lies cannot be told till a trial of the case on the merits, hence the necessity of a power to preserve the status quo pending the litigation, if that be necessary to make the final decree effective to do justice between the parties. . . . [I]t is . . . within the discretionary power of the court, by a temporary injunction, to preserve the status quo between the parties pending

28

the final decree, if that be necessary in order to make such decree effective <u>or to save the person claiming relief from irreparable injury by the conduct of his adversary pending the litigation</u>.

<u>Valley Iron Works Mfg. Co. v. Goodrick</u>, 103 Wis. 436, 444, 78 N.W. 1066 (1899) (emphasis added); <u>see also</u> <u>De Pauw v. Oxley</u>, 122 Wis. 656, 659, 100 N.W. 1028 (1904) ("[I]t is well-nigh an imperative duty of the court to preserve the status quo by temporary injunction, if its disturbance pendente lite will render futile in considerable degree the judgment sought[.]"). More recently, this court has explained, "[i]njunctions are not to be issued without a showing of . . . irreparable harm, but at the temporary injunction stage the requirement of irreparable injury is met by a showing that, without it to preserve the status quo [during litigation] . . . , the permanent injunction sought would be rendered futile." <u>Waste Mgmt., Inc.</u>, 84 Wis. 2d at 465 (quoting <u>Werner</u>, 80 Wis. 2d at 519).

¶80 In the context of this case, during which Zingsheim's survival hung in the balance, the preservation of the status quo reasonably meant the preservation of the opportunity for Zingsheim to obtain his ultimate requested relief: access to ivermectin. The status quo was life. Had Zingsheim died, obviously access to ivermectin would have been rendered futile. Notably, not all of this court's cases on temporary injunctive relief even impose a status quo requirement. <u>See</u> <u>James v. Heinrich</u>, Nos. 2020AP1419-OA, 2020AP1420-OA & 2020AP1446-OA, unpublished order, at 2 (Wis. Sept. 10, 2020).

¶81 The circuit court demonstrated it understood both perspectives on the status quo, and, unlike the court of appeals

29

majority, viewed the preservation of the status quo as the preservation of Zingsheim's right to self-determination. When Aurora's counsel tried to argue Gahl was changing the "status quo" the circuit court posed the following question:

> I have to interject a question here . . . . [W]e don't have -- And that's what's missing in the two doctors' affidavits. What is the ongoing medical protocol and treatment that's being pursued. I mean, if, in fact, . . . they're at the end of the line of their available treatments for . . . Zingsheim and they're saying, well, we put him on a ventilator and we're just going to, you know, see if he can fight this off without any further intervention, then the status quo is then, well, we'll just cross our fingers and hope for the best. And I don't mean to diminish their medical opinions, but I don't have anything in the record that says, well, what are we doing to treat this gentleman other than put him on a ventilator and hope for the best.

Quite clearly, the circuit court viewed the status quo as maintaining Zingsheim's life and well-being, not Aurora's denial of ivermectin. The court's framing of the issue comported with this court's precedent. The circuit court also repeatedly voiced its concerns for the "dire" situation. The court considered and rejected the view later maintained by the court of appeals majority regarding the status quo——no ivermectin—— which it was entitled (if not required) to do.

¶82 No member of this court or the court of appeals has suggested that Zingsheim had a different and adequate remedy available at law. "[G]iven Zingsheim's condition," no one suggests "a transfer to another hospital or checking out of Aurora" were plausible options. Gahl, 403 Wis. 2d 539, ¶83 n.10 (Grogan, J., dissenting). Death is irreversible. There is no

30

remedy at law or otherwise. "It is hard to have patience with people who say, 'There is no death' or 'Death doesn't matter.' There is death. And whatever is matters. And whatever happens has consequences, and it and they are irrevocable and irreversible." Gahl v. Aurora Health Care, Inc., No. 2021AP1787-FT, unpublished order, at 3 (Wis. Oct. 25, 2021) (Rebecca Grassl Bradley, J., dissenting) (quoting C.S. Lewis, A Grief Observed 15 (HarperCollins Paperback 1st ed. 1994) (1961)).

### B. Reasonable Probability of Success

¶83 Most of the majority opinion focuses on the reasonable probability of success. At points, the majority criticizes Gahl for, in its view, not stating a claim upon which relief could be granted. Majority op., ¶23. At other points, the majority acknowledges the circuit court grounded its decision in its "respect for an individual's right to choose their [sic] treatment," but the majority proclaims in conclusory fashion that something more was required. Id., ¶27. The majority is wrong.

### 1. Gahl Stated a Claim.

¶84 As a preliminary matter, the majority seems to adopt the court of appeals majority's insupportable assertion that "Gahl's claim must fail because he did not identify a source of law[.]" Id., ¶1; see also id., ¶16 (quoting Gahl, 403 Wis. 2d 539, ¶1 (majority op.)). Based on this mistaken premise, the majority holds Gahl failed to state a claim. Id., ¶23. At no point does the majority examine Article I, Section 1

31

of the Wisconsin Constitution, the informed consent statute, or the common law even though all were referenced in Gahl's petition for relief (among other legal authorities).

¶85 As a matter of natural law, people have a right "to make their own health care decisions." See Martin, 192 Wis. 2d at 171. This right to self-determination is protected by Article I, Section 1 of the Wisconsin Constitution, which this court has held protects an "independent right to liberty includ[ing] an individual's choice of whether or not to accept medical treatment." Lenz v. L.E. Phillips Career Dev. Ctr., 167 Wis. 2d 53, 69, 482 N.W.2d 60 (1992). But for his incapacitation, in a free market Zingsheim could have exercised this right by leaving the hospital; his condition precluded that option.

¶86 The right to self-determination is also protected by the informed consent statute. "The doctrine of informed consent comes from the common law and stems from the fundamental notion of the right to bodily integrity: '[e]very human being of adult years and sound mind has a right to determine what shall be done with his own body[.]'" Martin, 192 Wis. 2d at 169 (quoting Schloendorff v. Soc'y of N.Y. Hosp., 105 N.E. 92, 93 (1914), overruled on other grounds by Bing v. Thunig, 143 N.E.2d 3 (1957); citing Lenz, 167 Wis. 2d at 68). Interpreting this court's precedent, the court of appeals explained in a different decision, "the deference . . . [this precedent] pays to the patient's right to choose . . . his treatment is important because it demonstrates that the informed consent statute

32

protects more than merely the patient's right to obtain information." Schreiber v. Physicians Ins. Co. of Wis., 217 Wis. 2d 94, 105, 579 N.W.2d 730 (Ct. App. 1998), aff'd, 223 Wis. 2d 417, 588 N.W.2d 26 (1999). A right to informed consent presupposes a doctor cannot wholly "ignor[e] the patient's ultimate choice." Id. Particularly if the patient is trapped in a hospital, unable to leave, the informed consent statute would mean very little if it mandated only the provision of information by a doctor. See id. The court of appeals has therefore held "in addition to protecting the patient's right to obtain information, the informed consent statute must protect the patient's right to choose a medically viable treatment and have that choice respected by . . . his doctor." Id.

¶87 This court also recognizes the "common law right to self determination[.]" Lenz, 167 Wis. 2d at 67. This court has explained: "No right is held more sacred, or is more carefully guarded by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law." Id. at 68 (quoting Union Pac. Ry. v. Botsford, 141 U.S. 250, 251 (1891)). Zingsheim's self-determination was not constrained by any clear and unquestionable authority of law. It was constrained by his inability to leave the hospital.

¶88 Gahl also argued ivermectin fell within the standard of care. As the court of appeals has previously held:

> Where there are two or more medically acceptable
> treatment approaches to a particular medical problem,

33

> the informed consent doctrine, medical ethics, and the standard of care all provide that a competent patient has the absolute right to select from among these treatment options after being informed of the relative risks and benefits of each approach.

Schreiber, 217 Wis. 2d at 103. On appeal, this court affirmed on narrower grounds, emphasizing "this opinion should not be interpreted as requiring physicians to perform procedures they do not consider medically viable, procedures for which they lack the appropriate expertise, or procedures to which they are morally opposed." Schreiber, 223 Wis. 2d 417, ¶15. This court, however, did not withdraw language from the court of appeals decision and did not express disagreement with it. More importantly, the modified order in this case did not require any doctor to do anything. The circuit court received evidence sufficient to reasonably find that ivermectin was a viable medical treatment; Dr. Hagen's affidavit alone was a sufficient basis on which to make this finding. The circuit court therefore had authority to ensure Zingsheim had access to ivermectin. Schreiber, 217 Wis. 2d at 103.

¶89 Gahl identified multiple legal sources in his petition for relief; regardless, black-letter law does not require a specific citation to state a claim. "[L]egal theories need not be fully developed, or even expressly identified, at the pleading stage." Kohlbeck v. Reliance Const. Co., 2002 WI App 142, ¶12 n.3, 256 Wis. 2d 235, 647 N.W.2d 277 (citing Murray v. City of Milwaukee, 2002 WI App 62, ¶12 n.6, 252 Wis. 2d 613, 642 N.W.2d 541). In Murray v. City of Milwaukee, the court of appeals explained:

34

> The City contends that we should not address Murray's contention that the City erroneously exercised its discretion under Wis. Stat. § 895.35 because that was not alleged in the complaint, and Murray did not make that argument until his brief in opposition to the City's motion to dismiss. However, a complaint need not expressly identify a legal theory, but only the facts necessary to recover under that legal theory. . . . Because the City has had the opportunity, both in the trial court and in this court, to respond to Murray's legal theory . . . it is proper to decide the merits of this legal theory.

252 Wis. 2d 613, ¶12 n.6 (citing Nw. Nat. Cas. Co. v. State Auto. & Cas. Underwriters, 35 Wis. 2d 237, 241, 151 N.W.2d 104 (1967); Wis. Stat. § 802.02(1)). The decisions of the United States Supreme Court are in accord. See Johnson v. City of Shelby, 574 U.S. 10, 12 (2014) (per curiam) ("The federal rules effectively abolish the restrictive theory of pleadings doctrine, making it clear that it is unnecessary to set out a legal theory for the plaintiff's claim for relief." (quoting 5 Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1219 (3d ed. 2004))). That Court has reversed, without controversy, decisions of lower federal courts imposing a specific citation requirement to state a claim. Id. at 11-12.

### 2. The Circuit Court Correctly Analyzed the Reasonable Probability of Success Requirement.

¶90 The majority's analysis of the circuit court's reasoning on Gahl's reasonable probability of success is as wrong as it is confusing. On one hand, the majority acknowledges "there are no 'magic words' the circuit court must utter or any precise level of specificity that is required." Majority op., ¶26. Undoubtedly, this statement is correct. This court has rejected a so-called magic words requirement on

35

many occasions. <u>Marathon County v. D.K.</u>, 2020 WI 8, ¶66, 390 Wis. 2d 50, 937 N.W.2d 901 (Rebecca Grassl Bradley, J., concurring) ("We do not impose a 'magic words' requirement in the law and this court has repeatedly rejected them." (collecting cases)).

¶91 Contradicting its rejection of a magic words standard, the majority repeatedly faults the circuit court for not citing a specific source of law. <u>See, e.g.</u>, majority op., ¶12 ("There was no statutory basis or other legal foundation for the order set forth in its text."); <u>id.</u>, ¶21 n.7 ("The trial court . . . did not cite any actual law to support its order."); <u>id.</u>, ¶25 ("The circuit court's written order granting Gahl relief does not cite any statute, case, or other source of law as a foundation allowing for its issuance."); <u>id.</u> ("Absent any citation to law establishing a legal basis for the order, we cannot determine that the circuit court employed the reasoning process our precedent demands."). It then holds "[w]e need not address in depth any of Gahl's arguments because we do not know on what basis the circuit court issued the [temporary] injunction." <u>Id.</u>, ¶21.

¶92 The majority continues, "[t]he circuit court cited no law either in its written order or in its oral ruling," which the majority declares is "in itself" a reversible error. <u>Id.</u> Ironically, the majority does not cite any authority obligating the circuit court to provide a specific citation, wading into "the native land of the hypocrite." Oscar Wilde, <u>The Picture of Dorian Grey</u> 129 (Canterbury Classics 2013) (1891). No effort is

36

made by the majority to "determine . . . [whether] the circuit court employed the reasoning process our precedent demands" because, the majority claims, this inquiry is impossible without a specific citation by the circuit court. Majority op., ¶25.

¶93 Although the circuit court did not recite case precedent or statutory law, it explicitly espoused a "significant respect for an individual's right to choose and choose their treatment" clearly grounded in both. In light of the petition for relief and the record as a whole, this statement should be sufficient. After all, magic words are not required. The majority nevertheless claims "such a stray reference" is insufficient. Id., ¶27. It cites nothing to support this conclusion.

¶94 No general rule requiring the circuit court to cite a specific law exists, and in fact, this court has crafted a special rule requiring a specific statutory citation in just one context. See Langlade County v. D.J.W., 2020 WI 41, ¶3, 391 Wis. 2d 231, 942 N.W.2d 277. The creation of this special rule proves the general one. In Langlade County v. D.J.W., this court held that "going forward circuit courts in recommitment proceedings are to make specific factual findings with reference to the subdivision paragraph of Wis. Stat. § 51.20(1)(a)2. on which the recommitment is based." Id. The rule in D.J.W. was adopted, in part, because circuit courts left unstated the statutory basis of recommitments. D.J.W. facilitated appellate review by imposing a rule of judicial administration. Id., ¶40. D.J.W. is an anomaly in this court's jurisprudence. If it were

37

otherwise, this court would not have needed to make a ruling specific to recommitment cases. As D.J.W. shows, this court does not require circuit courts to cite specific legal authority as a basis for its decision.

¶95 The majority pretends the circuit court's reasoning was so bad that the majority cannot make heads or tails of it, but the reasoning is easily discernable. As Judge Grogan explained:

> What is clear from the record . . . is that the circuit court understood that likelihood of success on the merits was a required factor, that it was honed in on the competing medical opinions presented by Aurora's and Gahl's supporting physicians as to what treatment would or would not be appropriate for Zingsheim under the circumstances, and that the medical information from the parties' various physicians was central to its determination.

Gahl, 403 Wis. 2d 539, ¶84 (Grogan, J., dissenting). Critically, "[b]ased on the information in the record," the circuit court concluded Gahl had established a reasonable probability of success either under a "right to choose ivermectin" theory or because the "standard of care" required it. Id. Under the latter theory, the court did not have to conclude ivermectin was actually effective——merely that if the case were to continue, the trier of fact might so find. "The fact that the circuit court was presented with differing opinions about what treatment is proper for Zingsheim suggests the jury is still 'out' as to whether there is only one particular and established 'standard of care' in treating this novel virus." Id., ¶89. "Time will eventually reveal what the

38

standard of care or reasonable alternative treatment is for people in Zingsheim's position." Id.

¶96 The majority errs in treating this politically controversial case differently than other cases involving similar decisions. "Regardless of the extent of the . . . [circuit] court's reasoning, [a reviewing court] will uphold a discretionary decision if there are facts in the record which would support the trial court's decision had it fully exercised its discretion." Hurley, 361 Wis. 2d 529, ¶29 (quoted source omitted) (second modification in the original). Arguably, the majority must search the record for reasons to support the circuit court's decision. Altogether absent from the majority opinion is any attempt to read the record in a light favorable to the circuit court's discretionary decision. See State v. Johnson, 2021 WI 61, ¶34, 397 Wis. 2d 633, 961 N.W.2d 18 (quoting Gutierrez, 391 Wis. 2d 799, ¶27). Alternatively, the majority could remand the case to the circuit court to better explain its decision. X.S., 402 Wis. 2d 481, ¶58 n.1. When "there [is] room in the facts which d[o] not confine the [circuit] court to one result," remand is often the proper remedy. Id. (quoting Paschong, 16 Wis. 2d at 286) (first modification in the original). Outright reversal is a drastic remedy, not normally imposed unless the record is totally devoid of evidence supporting the circuit court's decision. See id., ¶56 (majority op.).

¶97 On a final note, the majority fails to appreciate the circumstances the circuit court faced when it made its decision.

39

"Wisconsin judges are rarely asked to make life-or-death decisions. This case present[ed] one of those rare circumstances [to the circuit court]. The circuit court made a decision on the side of life." Gahl, No. 2021AP1787-FT, at 3 (Oct. 25, 2021). Zingsheim had COVID-19, and Aurora placed Zingsheim on a ventilator. Death was a realistic possibility. Time was of the essence. As the circuit court recognized, the situation was "dire." The circuit court, which was not a medical professional, was presented with "polar opposite[]" information as to whether ivermectin was likely to improve Zingsheim's condition. Under such fast-paced, high-stakes circumstances, the majority commits an especially egregious error by demanding a "polished transcript" from the circuit court. See X.S., 402 Wis. 2d 481, ¶91 (Hagedorn, J., dissenting).

## IV. CONCLUSION

¶98 The circuit court considered the relevant facts and applied the correct legal standard to reach a reasonable decision in light of the life-or-death circumstances presented. Like the majority of the court of appeals, a majority of this court fails to look for reasons to sustain the circuit court's discretionary decision as the law requires. Under our highly deferential standard of review, the circuit court properly exercised its discretion in entering an order granting temporary injunctive relief to a man near death. I dissent.

APPENDIX: Unpublished Orders

<u>Gahl v. Aurora Health Care, Inc.</u>, No. 2021AP1787-FT, unpublished order (Wis. Oct. 25, 2022, <u>as amended</u> Oct. 28, 2022).

<u>Gahl v. Aurora Health Care, Inc.</u>, No. 2021AP1787-FT, unpublished order (Wis. Oct. 25, 2021).

<u>Gahl v. Aurora Health Care, Inc.</u>, No. 2021AP1787, unpublished order (Wis. Oct. 21, 2021).

<u>James v. Heinrich</u>, Nos. 2020AP1419-OA, 2020AP1420-OA & 2020AP1446-OA, unpublished order (Wis. Sept. 10, 2020).



OFFICE OF THE CLERK

Supreme Court of Wisconsin

110 EAST MAIN STREET, SUITE 215
P.O. BOX 1688
MADISON, WI 53701-1688

TELEPHONE (608) 266-1880
FACSIMILE (608) 267-0640
Web Site: www.wicourts.gov

October 25, 2022
*(Amended October 28, 2022)*

**To:**

Hon. Lloyd Carter
Circuit Court Judge
Waukesha County Courthouse
515 W. Moreland Blvd.
Waukesha, WI 53188

Monica Paz
Clerk of Circuit Court
Waukesha County Courthouse
515 W. Moreland Blvd.
Waukesha, WI 53188

Michael L. Johnson
Randall R. Guse
Jason J. Franckowiak
Otjen Law Firm
20935 Swenson Dr., Ste. 310
Waukesha, WI 53186

Ralph C. Lorigo
Lorigo Law Office
101 Slade Ave.
West Seneca, NY 14224

Karen L. Mueller
Amos Center for Justice and Liberty
18261 57th Ave.
Chippewa Falls, WI 547029

You are hereby notified that the Court has entered the following <u>AMENDED</u> order (amended to add dissent):

No. 2021AP1787-FT     <u>Gahl v. Aurora Health Care, Inc.</u>, L.C. #2021CV1469

Petitioner-respondent-petitioner, Allen Gahl, has filed a renewed motion to waive the requirement of Wis. Stat. § 809.19(2)(ae) that the appendix shall be filed as a single document and to allow him to e-file his 540 page appendix in five sections due to the size of the electronic files. Petitioner-respondent-petitioner states that he contacted the e-filing support line for assistance and they were unable to decrease the size of his appendix to allow for any less than five separate pdf files. In his original motion, petitioner-respondent-petitioner stated:

Page 2
October 25, 2022 (*Amended October 28, 2022*)
No. 2021AP1787-FT    Gahl v. Aurora Health Care, Inc., L.C. #2021CV1469

The reason for the large size of the appendix is to give this court of review the opportunity to see the evidence that Dr. Pierre Kory submitted in order to prove that the drug, Ivermectin was both safe and effective. . . . Judge Lloyd Carter did not have him testify but evidently Dr. Kory's presence and willingness to testify satisfied any hearsay issues or misgivings the court might have had regarding the extensive Exhibits and the Transcript of Dr. Kory's testimony before the U.S. Senate oversight committee for the Department of Homeland Security on December 8, 2020. . . . These documents and significant parts of the transcript are therefore all relevant to prove that Judge Carter did not abuse his discretion.

IT IS ORDERED that the motion to waive the requirement of Wis. Stat § 809.19(2)(ae) is denied. The Judicial Council Committee's Note, 1978 to Wis. Stat. § 809.19 states, "the original record serves as the primary evidence of what occurred in the trial court. The appendix becomes a very abbreviated document with only those items absolutely essential to an understanding of the case . . . . The failure to include some item in the appendix has no effect on the ability or willingness of the court to consider any matter in the record." The citations to the record contained in petitioner-respondent-petitioner's brief are sufficient to direct the court to Dr. Kory's testimony and exhibits. There is no need to reproduce that voluminous material again in the appendix.

PATIENCE DRAKE ROGGENSACK, J. (*dissenting*). Allen Gahl, as representative of John J. Zingsheim in the review pending before us, has moved us to permit exceptions to Wis. Stat. § 809.19(2) in three respects: (1) to permit the filing of an appendix of more than one volume; (2) to permit the electronic filing of an appendix of 540 pages; and (3) to permit the filing of 11 paper copies of the appendix, rather than 22 paper copies.

Aurora Health Care, Inc. did not oppose Gahl's motion. However, this court denied it. The court reasoned that denial was appropriate because the "Judicial Council Committee's Note, 1978 to Wis. Stat. § 809.19" says that an appendix is to be a "very abbreviated document," and because "[t]here is no need to reproduce that voluminous material [of the record] again in the appendix."[1] I could find no case where we denied a motion to modify Wis. Stat. § 809.19's directives based on a Judicial Council Committee Note and "no need" for a party's request.

The court could come to the conclusion "that there is no need" about any voluminous appendix; however, this court has not done so in other cases. For example, we permitted a two-volume appendix with a combined total of 890 pages to be filed as hard copy in Teigen v. WEC, 2022AP91 without a motion for multiple volumes. Gahl's appendices have a total of 540 pages.

I write in dissent because court rules should be applied with an even hand to all who interact in Wisconsin courts for pending disputes. I have concerns that Gahl is being treated differently because underlying the current motion is his effort to obtain treatment with Ivermectin for John J.

---

[1] Gahl v. Aurora Health Care, Inc., No. 2021AP1787-FT, unpublished order, at 2 (Wis. Oct. 25, 2022).

2

Page 3
October 25, 2022 (*Amended October 28, 2022*)
No. 2021AP1787-FT    Gahl v. Aurora Health Care, Inc., L.C. #2021CV1469

Zingsheim, who is a former patient in the Intensive Care Unit at Aurora Health Care medical center.

Gahl and treatment of Zingsheim with Ivermectin have a significant history in Wisconsin courts. It began in October of 2021 when Gahl filed an action in Waukesha County Circuit Court to obtain Ivermectin treatment for Zingsheim, which Aurora opposed.

After several hearings, the circuit court entered a temporary injunction on October 12, 2021 that ordered Aurora to administer Ivermectin treatment by a physician identified by Gahl. That same day, Aurora petitioned the court of appeals for interlocutory review, which was granted without a response from Gahl. Aurora also filed a notice of motion and motion for relief asking the circuit court to stay the order pending appeal. On October 13, 2021, the circuit court conducted an order to show cause hearing, and on October 14, 2021, the parties filed a mutually-agreed draft order they believed reflected the modifications resulting from the October 13, 2021 hearing. The draft order, in sum, required Gahl to: (1) locate a doctor to administer the prescribed Ivermectin; (2) have the doctor apply for temporary emergency privileges with Aurora's credentialing committee; and (3) sign a full release of Aurora from any liability related to the administration of Ivermectin.

Then, before the circuit court's temporary injunction could be placed in written form, the court of appeals stayed that order. Aurora did not ask the court of appeals to stay the circuit court's injunction.

On October 20, 2021, Gahl filed a petition to bypass the court of appeals. On October 25, 2021, we denied bypass, in a four to three decision.[2] On May 25, 2022, the court of appeals decided the pending appeal, concluding that the circuit court had no statutory or inherent power to order Aurora to provide treatment with Ivermectin.[3] Gahl petitioned us for review, which we granted. He then filed the current motion for relief from the requirements of Wis. Stat. § 809.19.

I would grant Gahl's motion because of the controversy that Ivermectin appears to have caused in courts' considerations of Gahl's petition for Zingsheim's treatment. For example, the court of appeals opinion discounts Ivermectin, asserting that Gahl's interest was "[b]ased on his internet research."[4]

I have no training or skill that would permit me to evaluate the medical merits of Ivermectin. However, part of the reason that Gahl is requesting permission to file an expanded appendix is to include testimony he submitted to the circuit court from medical experts who are of

---

[2] Gahl v. Aurora Health Care, Inc., No. 2021AP1787-FT, unpublished order (Wis. Oct. 25, 2021).

[3] Gahl v. Aurora Health Care, Inc., 2022 WI App 29, ¶¶1, 64, 403 Wis. 2d 539, 977 N.W.2d 756.

[4] Id., ¶3.

Page 4
October 25, 2022 (*Amended October 28, 2022*)
No. 2021AP1787-FT     Gahl v. Aurora Health Care, Inc., L.C. #2021CV1469

the opinion that Ivermectin has significant benefits for certain patients.  Although I could track down this testimony in the record, having it in the appendix will be a convenience to the justices who choose to read it.  Accordingly, I would grant Gahl's motion to file an expanded appendix, just as we allowed in Teigen, and I respectfully dissent from the court's decision denying the permission he requested.

I am authorized to state that CHIEF JUSTICE ANNETTE KINGSLAND ZIEGLER and JUSTICE REBECCA GRASSL BRADLEY join this dissent.

Sheila T. Reiff
Clerk of Supreme Court

4



OFFICE OF THE CLERK

## Supreme Court of Wisconsin

**110 EAST MAIN STREET, SUITE 215**
**P.O. BOX 1688**
**MADISON, WI 53701-1688**

TELEPHONE (608) 266-1880
FACSIMILE (608) 267-0640
Web Site: www.wicourts.gov

October 25, 2021

**To:**

Hon. Lloyd Carter
Circuit Court Judge
Waukesha County Circuit Court
515 W. Moreland Blvd.
Waukesha, WI 53188

Monica Paz
Clerk of Circuit Court
Waukesha County Courthouse
515 W. Moreland Blvd.
Waukesha, WI 53188

Ralph C. Lorigo
Lorigo Law Office
101 Slade Avenue
West Seneca, NY 14224

Randall R. Guse
Michael L. Johnson
Jason J. Franckowiak
Otjen, Gendelman, Zitzer,
Johnson & Weir, S.C.
20935 Swenson Dr., Ste. 310
Waukesha, WI 53186

Karen L. Mueller
Amos Center for Justice and Liberty
18261 57th Avenue
Chippewa Falls, WI 54729

You are hereby notified that the Court has entered the following order:

---

No. 2021AP1787-FT      Allen Gahl v. Aurora Health Care, Inc., L.C. 2021CV1469

The court has before it the emergency petition to bypass the court of appeals submitted pursuant to Wis. Stat. §§ 808.05 and 809.60 on behalf of petitioner-respondent, Allen Gahl, along with the response brief of respondent-petitioner, Aurora Health Care, Inc. ("Aurora Health") and the parties' joint status report regarding settlement.

This case commenced on October 7, 2021, when Gahl filed a complaint for emergency declaratory and injunctive relief in Waukesha County Circuit Court as attorney in fact for John Zingsheim, who is hospitalized at Aurora Medical Center - Summit. The complaint sought an order directing Aurora Health to enforce a prescription for Ivermectin written by a physician (Dr. Edward Hagen) not privileged to practice at Aurora Medical Center - Summit, and to order Aurora Health to immediately administer Ivermectin to Mr. Zingsheim. Aurora Health opposed the request, explaining, among other things, that Mr. Zingsheim's current health care providers at

Page 2
October 25, 2021
No. 2021AP1787          <u>Allen Gahl v. Aurora Health Care, Inc.</u>, L.C. 2021CV1469

Aurora Medical Center - Summit believe the administration of this drug would fall below and constitute a violation of professional medical standards of care because the prescribed dosage may be lethal, and cannot be administered to the patient, who is intubated.

On October 12, 2021, the circuit court conducted a hearing on the matter. The circuit court noted that the prescribing physician "has never met Mr. Zingsheim . . . [and has] never reviewed medical records from Mr. Zingsheim." At the conclusion of the hearing, the circuit court and the parties agreed that the parties would submit supplemental affidavits later that day to further inform the circuit court's decision-making. The parties timely submitted supplemental affidavits.

Just before 5:00 p.m. on October 12, 2021, the circuit court issued an "Order to Show Cause," stating that "on the 12th day of October, 2021, at 1:30 pm [sic]," the court would hold a hearing at which Aurora Health would be required to show cause why it should not be compelled "to comply with Dr. Hagen's, order and prescription to administer Ivermectin to their mutual patient, John Zingsheim, and thereafter as ordered by Dr. Hagen." The order additionally ordered Aurora Health to "immediately enforce Dr. Hagen's, [sic] order and prescription to administer Ivermectin to their mutual patient, Mr. Zingsheim, and thereafter as further ordered by Mr. Gahl."

That same day, in response to the circuit court's "Order to Show Cause," Aurora Health filed three items: (1) a letter with the circuit court identifying certain concerns with the order; (2) a notice of motion and motion for relief, asking the circuit court to stay the order pending appeal; and (3) a petition and memorandum filed in the court of appeals seeking leave to appeal the circuit court's non-final order.

On October 13, 2021, the circuit court conducted an order to show cause hearing. Counsel for Aurora Health explained that day that Mr. Zingsheim had tested negative for COVID-19. The court stated during that hearing that it intended to modify the order it had issued on October 12, 2021. The court and the parties discussed various modifications.

On October 14, 2021, the parties filed for the circuit court's consideration a mutually-agreed draft order that they believed accurately reflected the modifications that the circuit court had found to be appropriate during the October 13, 2021 hearing. Summarized, this draft order required Gahl to: (1) locate a doctor to administer the Ivermectin prescribed by Dr. Hagen to Zingsheim; (2) have this doctor apply with the Aurora credentialing committee for temporary emergency privileges at Aurora for the sole purpose of administering the Ivermectin to Zingsheim; and (3) sign a full release of Aurora from all liability related to the administration of the Ivermectin.

On the same day, before any modified order issued, the court of appeals granted Aurora Health's petition and memorandum for leave to appeal the circuit court's non-final order of October 12, 2021, and, sua sponte, stayed the circuit court order and the circuit court proceedings.

On October 20, 2021, Gahl filed this pending emergency petition to bypass the court of appeals. By order dated October 21, 2021, this court directed the respondent, Aurora Health, to file a response to the petition to bypass no later than 12:00 noon on October 22, 2021. The court

Page 3
October 25, 2021
No. 2021AP1787          <u>Allen Gahl v. Aurora Health Care, Inc.</u>, L.C. 2021CV1469

further directed the parties to file a joint status report outlining any efforts towards the settlement of this matter by the same date and time. The documents were timely filed. Aurora Health writes that it "takes no position on the Petition to Bypass so long as the parties will be permitted the necessary opportunity to fully and adequately brief the issue presented on appeal, should this Court take jurisdiction of the appeal."

The question for this court is whether to grant the petition to bypass. A matter appropriate for bypass is usually one which meets one or more of the criteria for review, Wis. Stat. § (Rule) 809.62(1r), and one the court concludes it ultimately will choose to consider regardless of how the court of appeals might decide the issues. At times, a petition for bypass will be granted where there is a clear need to hasten the ultimate appellate decision. S. Ct. Internal Operating Procedures III.B.2.

IT IS ORDERED that the petition for bypass is denied. The petition presents unresolved questions of fact and fails to establish that this case presents a sufficiently well-developed legal issue that meets our criteria for review.

REBECCA GRASSL BRADLEY, J. (*dissenting*).

"It is hard to have patience with people who say, 'There is no death' or 'Death doesn't matter.' There is death. And whatever is matters. And whatever happens has consequences, and it and they are irrevocable and irreversible."

—C.S. Lewis, <u>A Grief Observed</u> 15 (HarperCollins Paperback 1st ed. 1994) (1961).

Wisconsin judges are rarely asked to make life-or-death decisions. This case presents one of those rare circumstances. The circuit court made a decision on the side of life. The appellate courts chose the irrevocable and irreversible alternative. But nothing in the law compelled it.

In this case, the family of John Zingsheim, who is on a ventilator and in a drug-induced coma battling COVID-19, asked the circuit court to order potentially life-saving treatment Mr. Zingsheim's doctor prescribed—Ivermectin—but Aurora Medical Center-Summit declined to administer it. After reviewing evidence, hearing testimony, and considering arguments, the circuit court ordered Aurora to administer the treatment. While Aurora's interlocutory appeal was pending, the parties agreed that Aurora would grant temporary privileges to a doctor—chosen by the family—to administer the medication, while the family would release Aurora from any liability arising from it. The circuit court modified its order to reflect the agreement. The court of appeals stayed the circuit court order and proceedings, without knowledge of the substance of the modification, <u>even though Aurora did not ask the court of appeals for such relief</u>. Mr. Zingsheim's family petitioned this court to take the case but a majority of this court, after senselessly delaying the matter, now refuses to act at all.

If Aurora is right and a court cannot compel a health care provider to administer treatment it considers ill-advised, the circuit court's decision is reversible, but in the meantime Mr. Zingsheim

Page 4
October 25, 2021
No. 2021AP1787          <u>Allen Gahl v. Aurora Health Care, Inc.</u>, L.C. 2021CV1469

receives the potentially life-saving treatment he and his family desire and his physician prescribed. In stark contrast, the unreasoned decision of the court of appeals to deny Mr. Zingsheim that treatment, and the refusal of a majority of this court to act, impose irrevocable and irreversible consequences on Mr. Zingsheim, who will receive only palliative care going forward.

Aurora asked the court of appeals to decide the following issue:

Did the Trial Court improperly exceed its authority or otherwise enter the Order to Show Cause, which compels a healthcare provider independently licensed by the State of Wisconsin to administer medical treatment which the healthcare provider believes falls below the professional standard of care?

The legal question Aurora raises should be answered, after briefing and oral argument, and in the form of a reasoned opinion. But in this case, the modified order does not compel any healthcare provider to administer treatment. The court of appeals nevertheless accepted the appeal on an interlocutory basis and effectively answered the question in Aurora's favor, but with no analysis, and also issued a stay of the circuit court's order the court of appeals hadn't even seen—a stay that no one requested. The modified order reflecting the parties' agreement did not compel Aurora (or any other unwilling provider) to administer the treatment prescribed by Mr. Zingsheim's physician. Aurora itself acknowledges that the legal issue in this case "transcends" the treatment Mr. Zingsheim individually receives.[1] Of course, for Mr. Zingsheim the importance of that legal issue pales in comparison to the immediate resolution of a medical dispute over his wish to try potentially life-saving treatment. Seemingly recognizing this, Aurora never asked the court of appeals to stay the circuit court's order, never urged this court to maintain that stay, and took no position on the petition to bypass; instead, Aurora urged the court to afford the parties sufficient opportunity for thorough briefing necessary for careful consideration of the legal question it poses. And rightly so. The issue presented is unquestionably of great significance and importance to health care providers, patients, and their families statewide, particularly during an ongoing pandemic for which much of the medical community offers no remedy. The answer to this question must come in the course of the appellate process. In contrast, Mr. Zingsheim cannot wait for this court to reverse a stay issued with no legal basis.

Although both parties emphasize the importance of the issues presented by this case, the same majority of this court that regularly takes a pass on significant cases (Justices Ann Walsh Bradley, Rebeca Frank Dallet, Brian Hagedorn, and Jill Karofsky)[2] again can't be bothered to

---

[1] Aurora's Response Br. at 11.

[2] <u>Hawkins v. Wis. Elections Comm'n</u>, 2020 WI 75, 393 Wis. 2d 629, 948 N.W.2d 877 (per curiam); <u>Stempski v. Heinrich</u>, No. 2021AP1434-OA, unpublished order (Wis. S. Ct. Aug. 27, 2021); <u>Gymfinity, Ltd. v. Dane Cnty.</u>, No. 2020AP1927-OA, unpublished order (Wis. S. Ct. Dec. 21, 2020); <u>Wis. Voters All. v. Wis. Elections Comm'n</u>, No. 2020AP1930-OA, unpublished order (Wis. S. Ct. Dec. 4, 2020); <u>Trump v. Evers</u>, No. 2020AP1971-OA, unpublished order (Wis. S. Ct.

Page 5
October 25, 2021
No. 2021AP1787       <u>Allen Gahl v. Aurora Health Care, Inc.</u>, L.C. 2021CV1469

resolve a pressing dispute of grave importance to the people of Wisconsin, which Aurora recognizes is likely to recur.[3] "A matter appropriate for bypass is usually one which meets one or more of the criteria for review, Wis. Stat. § (Rule) 809.62(1), and one the court concludes it ultimately will choose to consider regardless of how the Court of Appeals might decide the issues."[4] In addition to presenting a novel issue this court will likely be called upon to resolve, this case meets at least two criteria for this court's review: "A decision by the supreme court will help develop, clarify or harmonize the law, and . . . 2. The question presented is a novel one, the resolution of which will have statewide impact" and the issue "is not factual in nature but rather is a question of law of the type that is likely to recur unless resolved by the supreme court." Wis. Stat. §809.62(1r)(c)2 and 3 (2019–20).

Sometimes urgency itself warrants this court's review. "At times, a petition for bypass will be granted where there is a clear need to hasten the ultimate appellate decision."[5] Given Mr. Zingsheim's declining medical condition, there is unquestionably a clear need to hasten the ultimate appellate decision in this case. Even if the majority does not regard Mr. Zingsheim's individual circumstances as justification for supreme court action, the likely recurrence of the novel legal issue presented during a pandemic, as acknowledged by Aurora, warrants this court's immediate attention in light of its statewide impact on the people of Wisconsin, including health care providers and their patients. "'[A] speedy resolution, and one with clarity and finality,' is often 'in the public's best interest' with respect to cases involving COVID-19 related legal issues."[6]

Even if the majority requires the insights of the court of appeals before it is ready to tackle the issues presented, it was duty-bound under the law to reverse the stay imposed by the court of appeals. No party asked for one. Nevertheless, before entertaining this remedy, the court of appeals was supposed to consider and weigh a number of factors. In this case, it completely sidestepped this legal prerequisite.

_____

Dec. 3, 2020); <u>Mueller v. Jacobs</u>, No. 2020AP1958-OA, unpublished order (Wis. S. Ct. Dec. 3, 2020).

[3] Aurora's Response Br. at 9.

[4] Wis. S. Ct. IOP III.B.2 (June 30, 2021).

[5] <u>Id.</u>

[6] <u>Stempski</u>, No. 2021AP1434-OA, at 9 n.11 (Rebecca Grassl Bradley, J., dissenting from the order denying the petition for leave to commence an original action) (quoting Skylar Reese Croy, <u>As I See It: Examining the Supreme Court's Broad Original Jurisdiction</u>, Wis. Law., July-Aug. 2021, at 31, 34, https://www.wisbar.org/NewsPublications/WisconsinLawyer/Pages/Article.aspx?Volume=94&Issue=7&ArticleID=28514).

Page 6
October 25, 2021
No. 2021AP1787          <u>Allen Gahl v. Aurora Health Care, Inc.</u>, L.C. 2021CV1469

          In <u>State v. Gudenschwager</u>, 191 Wis. 2d 431, 440, 529 N.W.2d 225 (1995), this court held that a stay pending appeal is appropriate only if the moving party makes a strong showing that it is likely to succeed on the merits of the appeal <u>and</u> shows (1) it will suffer irreparable injury unless a stay is granted; (2) the other party will not be substantially harmed; and (3) a stay will not harm the public interest. In this case, the court of appeals paid lip service to the likelihood of success on the merits, concluding without any analysis that Aurora was likely to succeed on its appeal. The court of appeals erred in completely neglecting to address the other mandatory factors, which overwhelmingly militate against imposing a stay of the circuit court's order. Aurora would not suffer irreparable injury absent a stay; the modified order to which the parties agreed required Mr. Zingsheim's family to procure a physician to administer the medication and to release Aurora from any liability arising from the treatment. Although resolution of the legal issue presented impacts the public more broadly, the public interest is arguably not implicated by the administration of prescribed medication to a dying individual who wishes to try it. The single factor that tips the balance overwhelmingly against the imposition of a stay is the substantial and irrevocable harm it inflicts on Mr. Zingsheim. Without the medication, he will receive only palliative care that ostensibly will make him more comfortable but will do nothing to improve his dire condition. The court of appeals neglected to perform this analysis and this critical error warrants reversal of the stay.[7]

          Judicial decisions have consequences. While every judicial decision must be well-grounded in the law, in this case nothing in the law supports the court of appeals' decision nor compels this court's inaction. The likely consequence of those unreasoned decisions is irrevocable, irreversible, and grave harm inflicted on Mr. Zingsheim. I dissent.

          I am authorized to state that Chief Justice ANNETTE KINGSLAND ZIEGLER and Justice PATIENCE DRAKE ROGGENSACK join this dissent.

Sheila T. Reiff
Clerk of Supreme Court

---

[7] "The court of appeals should explain its discretionary decision-making to ensure the soundness of that decision-making and to facilitate judicial review. We therefore conclude that the court of appeals' failure to explain its exercise of discretion in the instant case is an erroneous exercise of discretion." <u>State v. Scott</u>, 2018 WI 74, ¶¶40–41, 382 Wis. 2d 476, 914 N.W.2d 141. This court would have been well-within its authority to vacate the stay. Under Wis. Stat. § 809.60(4) (2019–20), "the supreme court may grant the petition upon such conditions as it considers appropriate."



**OFFICE OF THE CLERK**

# Supreme Court of Wisconsin

**110 EAST MAIN STREET, SUITE 215**
**P.O. BOX 1688**
**MADISON, WI 53701-1688**

TELEPHONE (608) 266-1880
FACSIMILE (608) 267-0640
Web Site: www.wicourts.gov

October 21, 2021

**To:**

Hon. Lloyd Carter
Circuit Court Judge
Waukesha County Circuit Court
515 W. Moreland Blvd.
Waukesha, WI 53188

Monica Paz
Clerk of Circuit Court
Waukesha County Courthouse
515 W. Moreland Blvd.
Waukesha, WI 53188

Randall R. Guse
Michael L. Johnson
Otjen, Gendelman, Zitzer,
Johnson & Weir, S.C.
20935 Swenson Dr., Ste. 310
Waukesha, WI 53186

Ralph C. Lorigo
Lorigo Law Office
101 Slade Avenue
West Seneca, NY 14224

Karen L. Mueller
Amos Center for Justice and Liberty
18261 57th Avenue
Chippewa Falls, WI 54729

You are hereby notified that the Court has entered the following order:

No. 2021AP1787          Allen Gahl v. Aurora Health Care, Inc., L.C. 2021CV1469

On October 20, 2021, an emergency petition to bypass the court of appeals was filed pursuant to Wis. Stat. §§ 808.05 and 809.60 on behalf of petitioner-respondent Allen Gahl, attorney in fact, on behalf of his principal, John J. Zingsheim.

The court of appeals granted Aurora Health Care's petition for leave to appeal and stayed the circuit court proceedings on October 14, 2021. Gahl did not file this bypass petition until six days later, on October 20, 2021. Despite the time-sensitive nature of the request, it is appropriate to give Aurora Health Care a brief period of time to respond.

Page 2
October 21, 2021
No. 2021AP1787          Allen Gahl v. Aurora Health Care, Inc., L.C. 2021CV1469


IT IS ORDERED the respondent-petitioner, Aurora Health Care, is directed to file a response to the petition to bypass no later than 12:00 noon on Friday, October 22, 2021;

IT IS FURTHER ORDERED that, no later than 12:00 noon on Friday, October 22, 2021, the parties shall file with the court a joint status report outlining any efforts towards the settlement of this matter; and

IT IS FURTHER ORDERED that the response and the joint status report shall each be filed as an attachment in pdf format to an email addressed to clerk@wicourts.gov. See Wis. Stat. §§ 809.70, 809.80 and 809.81. A paper original and 10 copies of each filed document must be received by the clerk of this court by 12:00 noon of the business day following submission by email, with the document bearing the following notation on the top of the first page: "This document was previously filed via email."

REBECCA GRASSL BRADLEY, J. (*dissenting*). Justice delayed is justice denied.[1] For John Zingsheim, justice delayed is a probable death sentence. As a result of contracting COVID-19, Mr. Zingsheim has been on a ventilator for more than two weeks, in a drug-induced coma. Consistent with Mr. Zingsheim's expressed wishes before ventilation, his nephew, Allen Gahl, who has power of attorney for making health care decisions on behalf of Mr. Zingsheim, sought a court order for the administration of Ivermectin after Aurora Health Care refused Mr. Zingsheim this treatment, which had been prescribed by Mr. Zingsheim's physician. After conducting hearings and considering the evidence presented, the Waukesha County Circuit Court[2] ordered Aurora to administer the medication. The parties later stipulated that Aurora would grant a physician, identified by Mr. Gahl, temporary, emergency privileges to enter the hospital and administer the medication, and Mr. Gahl would release Aurora from any claims arising from this arrangement. After a hearing, the circuit court agreed to enter a modified order reflecting these terms.

---

[1] "When justice is not forthcoming, when it is deferred too long, the result may be extreme injustice." Strachan v. Colon, 941 F.2d 128, 129 (2d Cir. 1991) ("For that reason the 40th clause of Magna Carta provided that justice be to none denied or delayed. 1 W.S. Holdsworth, A History of English Law, 57-58 (3rd ed. 1922). This ancient tenet of the law has been capsulized in the expression 'justice delayed is justice denied.'"). Nearly a century ago, this court emphasized we should "use all reasonable and lawful means to see that [our work] is done as expeditiously as circumstances will permit." See In re Snyder, 184 Wis. 10, 12, 198 N.W. 616 (1924). This court recognized "an insistent and well-founded demand by the public for a speedy and effective administration of justice, and it has been the constant effort of this court to meet such demand . . . because it is inherently reasonable and just." Id. at 13.

[2] The Honorable Lloyd V. Carter presiding.

Page 3
October 21, 2021
No. 2021AP1787　　　Allen Gahl v. Aurora Health Care, Inc., L.C. 2021CV1469

After the parties presented the circuit court with the modified written order, the District II Court of Appeals[3] granted Aurora's petition for leave to appeal the circuit court's original order, and, on its own motion and with no reasoning whatsoever,[4] stayed the circuit court's order, despite no party requesting this action. It appears the court of appeals was unaware of the substance of the order it nevertheless decided to stay; the court of appeals wrote "[t]o the extent there have been any modifications to that order at the October 13, 2021 hearing, the parties may address the effect of those modifications in their appellate briefing."[5] The court of appeals then gave the parties five days to let the court know whether they would like an expedited briefing schedule. This means Mr. Zingsheim will be denied the treatment he desires and his own physician prescribes, while Aurora offers only palliative care, maintaining Mr. Zingsheim on a ventilator and in an induced coma.[6] Mr. Gahl's attorney described the situation to the circuit court in the following terms:

> That ventilator is damaging his lungs on a daily basis. It's my understanding that he may actually have some perforations in his lungs today as a result of the ventilator. That's what ventilators do. They scar the tissue in your lungs and the pressure can blow holes, actually pierce the lungs, and can create permanent damage. That's why it is an emergency situation. That's why it is important that every day matters in terms of giving this patient Ivermectin.[7]

---

[3] On the panel were Judges Mark Gundrum, Lisa Neubauer, and Paul Reilly.

[4] Gahl v. Aurora Health Care, Inc., No. 2021AP001787, unpublished order (Oct. 14, 2021) (per curiam) (granting leave to appeal and staying the circuit court's order and proceedings on its own motion).

[5] Id.

[6] Petition to Bypass at 2–3 ("On October 12, 2021, the Circuit Court signed an Order to Show Cause, thereby ordering Respondents/Petitioners to administer Ivermectin to John Zingsheim, in what was thought to be a final effort to save his life. On that same day the Respondents/Petitioners filed a Petition to the Appeal Court of Wisconsin. The next day following another attorney conference/hearing with . . . [the circuit court] and in an attempt to reach a compromise, it was decided that the family would find an outside doctor to administer the Order the next day on Oct. 13, 2021. The doctor submitted information so that he could be credentialed in an expedited fashion; he obtained the necessary medical malpractice insurance and Allen Gahl, Health Care POA signed a release of liability agreement indemnifying Aurora Health Care, Inc. The proposed agreement to the Order was drafted and was filed with the Court on October 13, 2021. However, on October 14, 2021 the Wisconsin Appeals Court granted the Respondent's/Petitioner's appeal and sua sponte, 'on our own motion, stayed the Order and Circuit Court proceedings pending resolution of this appeal.' That decision ended John Zingsheim's chance for having Ivermectin administered to him anytime in the near future.").

[7] Hearing Transcript at 17 (Oct. 13, 2021).

Page 4
October 21, 2021
No. 2021AP1787          Allen Gahl v. Aurora Health Care, Inc., L.C. 2021CV1469

In the meantime, the court of appeals would eventually establish a briefing schedule, perhaps hear oral arguments, and at some point in the indefinite future, release an opinion. Not surprisingly, Mr. Gahl seeks emergency relief from this court, asking on behalf of Mr. Zingsheim "a chance, even if a small one, to preserve his own life[.]"[8] A majority of this court denies Mr. Zingsheim this chance, instead deferring—despite the life-or-death circumstances presented—the rather simple decision of whether to take the case or permit it to proceed before the court of appeals.

While appellate courts have all the luxury of time to ponder the law, Mr. Zingsheim, fighting for his life, does not. Circuit courts are best equipped to make these sorts of frontline decisions, in which time is of the essence. This court should summarily reverse the court of appeals' unreasoned decision to stay the circuit court order (or at the very least stay the court of appeals' unlawful stay)[9] while it carefully considers and resolves the legal issues presented. Such action falls well within our constitutionally-conferred authority.[10] Instead, the majority chooses to effectively deny Mr. Zingsheim any meaningful relief, all but guaranteeing him an irreversibly grave outcome, even if his attorneys ultimately prevail. I dissent.

I am authorized to state that Chief Justice ANNETTE KINGSLAND ZIEGLER and Justice PATIENCE DRAKE ROGGENSACK join this dissent.

Sheila T. Reiff
Clerk of Supreme Court

---

[8] Petition to Bypass at 7.

[9] State v. Scott, 2018 WI 74, ¶¶40–41, 382 Wis. 2d 476, 914 N.W.2d 141 ("The court of appeals should explain its discretionary decision-making to ensure the soundness of that decision-making and to facilitate judicial review. We therefore conclude that the court of appeals' failure to explain its exercise of discretion in the instant case is an erroneous exercise of discretion.")

[10] Article VII, Section 3 of the Wisconsin Constitution confers on the Supreme Court superintending authority "over all courts," which "endows this court with a power that is indefinite in character, unsupplied with means and instrumentalities, and limited only by the necessities of justice." Arneson v. Jezwinski, 206 Wis. 2d 217, 225, 556 N.W.2d 721 (1996).



OFFICE OF THE CLERK

## Supreme Court of Wisconsin

**110 EAST MAIN STREET, SUITE 215**
**P.O. BOX 1688**
**MADISON, WI 53701-1688**

TELEPHONE (608) 266-1880
FACSIMILE (608) 267-0640
Web Site: www.wicourts.gov

September 10, 2020

**To:**

Remzy D. Bitar
Sadie Ramona Zurfluh
Municipal Law & Litigation Group, S.C.
730 N. Grand Ave.
Waukesha, WI 53186

Marcia A. MacKenzie
Dane County Corporation Counsel
Room 419
210 Martin Luther King, Jr. Blvd.
Madison, WI 53703-3345

Bernardo Cueto
WISLawyer LLC
P.O. Box 68
Onalaska, WI 54650-0068

Joseph W. Voiland
Veterans Liberty Law
519 Green Bay Road
Cedarburg, WI 53012

Brent Eisberner
Levine Eisberner, LLC
14 W. Mifflin St., Ste. 206
Madison, WI 53703-2568

Colin Hector
Colin Thomas Roth
Assistant Attorney General
P.O. Box 7857
Madison, WI 53707-7857

*Address list continued on page 10.

You are hereby notified that the Court has entered the following order:

Nos. 2020AP1419-OA   James v. Heinrich
    2020AP1420-OA   Wis. Council of Religious and Indep. Schools, et al. v. Heinrich, et al.
    2020AP1446-OA   St. Ambrose Academy, Inc., et al. v. Parisi, et al.

Pending before this court are three separate petitions for leave to commence an original action relating to Dane County Emergency Order #9: (1) James v. Heinrich, Case No. 2020AP1419; (2) Wis. Council of Religious and Indep. Schools, et al. v. Heinrich, et al., Case No. 2020AP1420; and (3) St. Ambrose Academy, Inc. v. Parisi, et al., Case No. 2020AP1446.

15

Page 2
September 10, 2020
Nos. 2020AP1419-OA    James v. Heinrich
    2020AP1420-OA    Wis. Council of Religious and Indep. Schools, et al. v. Heinrich, et al.
    2020AP1446-OA    St. Ambrose Academy, Inc., et al. v. Parisi, et al.


Responses to each of the petitions and non-party briefs, amicus curiae, have also been filed. The petitioners in two of these matters have requested emergency temporary injunctive relief.[1]

IT IS ORDERED that the petitions for leave to commence an original action are granted and this court assumes jurisdiction over these actions. These three matters shall be consolidated for purposes of briefing and oral argument in this court;

IT IS FURTHER ORDERED that within 30 days after the date of this order the Petitioners shall file a single, combined brief in this court that shall not exceed 75-pages (16,500 words); that within 20 days of filing of the petitioners' brief, the Respondents shall file a single, combined responsive brief that shall not exceed 75-pages (16,500 words); and within 10 days of filing of the Respondents' brief, the Petitioners may each file a reply brief that shall not exceed 13 pages (3,000 words) or a statement that no reply brief will be filed; and

IT IS FURTHER ORDERED that the appendix to the Petitioners' brief shall contain a stipulation from all parties on the facts that are undisputed and those that may be in dispute; as part of the stipulation process the parties shall endeavor in good faith to identify those facts that are strictly relevant to the legal issues in the case, and endeavor to reach agreement on them; this court may, in its discretion, upon prior notice to the parties, direct the matter to a circuit court or referee for resolution of relevant facts that remain in dispute, Wis. Stat. § 751.09;

IT IS FURTHER ORDERED that pending this court's consideration of the merits of these matters, those provisions of Emergency Order #9 issued by Public Health Madison & Dane County on August 21, 2020, as amended September 1, 2020, which purport to prohibit schools throughout Dane County from providing in-person instruction to students, are temporarily enjoined, effective the date of this order.

Petitioners request temporary injunctive relief. To obtain temporary injunctive relief a movant must show (1) a reasonable probability of success on the merits; (2) lack of an adequate remedy at law; (3) the movant will suffer irreparable harm in the absence of an injunction; and (4) that a balancing of the equities favors issuing the injunction. See, e.g., Pure Milk Products Coop. v. National Farmers Org., 90 Wis. 2d 781, 800, 280 N.W.2d 691 (1979); Werner v. A.L. Grootemaat & Sons, Inc., 80 Wis. 2d 513, 520, 259 N.W.2d 310 (1977)). At times, this court has also noted that "[t]emporary injunctions are to be issued only when necessary to preserve the status quo." Werner, 80 Wis. 2d at 520. We conclude temporary injunctive relief is warranted.

---

[1] The Department of Health Services (DHS) is not a party to this lawsuit. Therefore, notwithstanding Justice Dallet's dissent, this order expresses no opinion about the scope or limits of DHS's power or authority.

Page 3
September 10, 2020
Nos. 2020AP1419-OA     James v. Heinrich
     2020AP1420-OA     Wis. Council of Religious and Indep. Schools, et al. v. Heinrich, et al.
     2020AP1446-OA     St. Ambrose Academy, Inc., et al. v. Parisi, et al.


First, based upon the briefing submitted at this stage, Petitioners are likely to succeed on the merits of their claim. Petitioners assert that provisions of Section 4(d) of Public Health Madison & Dane County Emergency Order #9, which limit in-person student instruction for all schools in Dane County based on certain criteria, exceed Respondents' authority. Multiple arguments—constitutional, statutory, and administrative—are lodged against the Order. While reserving the remaining claims for later disposition, we conclude that local health officers do not appear to have statutory authority to do what the Order commands.

The stated legal basis for the Order rests in the statutory grant of duties and certain powers to local health officers in Chapter 252, which contains the legislature's grant of authority to the executive branch over communicable diseases. Wisconsin Stat. § 252.02 (2017–18)[2] prescribes certain duties and grants specific powers to the Department of Health Services (DHS). Of particular note, subsection (3) grants DHS power to "close schools and forbid public gatherings in schools, churches, and other places to control outbreaks and epidemics." The powers and duties entrusted to local health officers, however, are different. In the very next section, Wis. Stat. § 252.03, the legislature conspicuously omits the power to "close schools" in its grant of authority to local health officers. Local health officers may similarly "forbid public gatherings when deemed necessary to control outbreaks or epidemics" and are given authority to "inspect schools . . . to determine whether the buildings are kept in a sanitary condition." § 252.03(1)–(2). But the explicit power to "close schools" is statutorily absent.

This differential grant of power must be given full meaning and effect. See State v. Dorsey, 2018 WI 10, ¶29, 379 Wis. 2d 386, 906 N.W.2d 158 (holding that the provision of a specific statutory exception "implies that no other exceptions are intended") (citing Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 107–11 (2012) ("The expression of one thing implies the exclusion of others (expressio unius est exclusio alterius).")). Both Wis. Stat. § 252.02 and Wis. Stat. § 252.03 were drafted at the same time and by the same legislature, so no historical quirk or later amendment, at least that has been revealed at this stage of the proceedings, would suggest anything other than the legislature granted DHS and local health officers different powers.

Heinrich responds that she is not closing schools, just preventing in-person instruction. But this statute was drafted in 1923, so the most reasonable reading of what it means to "close schools" would seem to be to preventing in-person instruction, not just preventing learning generally. Indeed, Secretary Palm's order that we addressed last term in Wis. Legislature v. Palm, 2020 WI 42, 391 Wis. 2d 497, 942 N.W.2d 900, contained a section closing schools to in-person

---

[2] All subsequent references to the Wisconsin Statutes are to the 2017–18 version unless otherwise indicated.

Page 4
September 10, 2020
Nos. 2020AP1419-OA    James v. Heinrich
    2020AP1420-OA    Wis. Council of Religious and Indep. Schools, et al. v. Heinrich, et al.
    2020AP1446-OA    St. Ambrose Academy, Inc., et al. v. Parisi, et al.

learning,[3] a provision defended by Secretary Palm in part on the grounds that Wis. Stat. § 252.02(3) grants her power to "close schools."

Heinrich also argues that the Order is authorized because Wis. Stat. § 252.03(2) states that she "may do what is reasonable and necessary for the prevention and suppression of disease," and that this Order constitutes a permissible restriction on "public gatherings."  However, what is reasonable and necessary cannot be read to encompass anything and everything.  Such a reading would render every other grant of power in the statute mere surplusage.  And a reading that gives carte blanche authority to a local health officer to issue any dictate she wants, without limit, would call into question its compatibility with our constitutional structure.  See State ex rel. Adams v. Burdge, 95 Wis. 390, 399-400, 70 N.W. 347 (1897).  Similarly, the statutory power to forbid public gatherings is given to both DHS and local health officers.  But only DHS is given the power to "close schools."  Therefore, whatever the permissible applications of the statutory power to forbid public gatherings may be, the text suggests it does not and cannot extend to the broader power of DHS to close schools in the fashion accomplished in the Order.

In short, Petitioners are likely to succeed on the merits of their argument that the Order's broad closure of schools in this case is not within the statutory grant of power to local health officers in Wis. Stat. § 252.03.

Beyond likelihood of success, Petitioners also have shown no legal remedy is available and that failure to grant an injunction would cause irreparable harm.  Unquestionably, denying students in-person education has the potential to harm the educational institution-Petitioners, as well as the parent-Petitioners and their children.  As Petitioners assert, many parents irreparably lose the full benefits of the communal education they chose for their children, including in-person instruction, relationships with teachers and other students, and religious and spiritual formation.  And while technology may mitigate some ill-effects for some students, Petitioners maintain that distance and technology-based learning is less than ideal, if not harmful, for many students.  Absent an injunction, Petitioners will not have a second opportunity to provide in-person instruction for classes currently underway.  Tellingly, neither Respondents' brief nor the Attorney General's amicus brief disputes Petitioners' claims of irreparable harm or lack of a legal remedy.

We recognize competing considerations and policy choices underlying the Order, but we conclude that on balance the equities favor issuance of a temporary injunction.   See Pure Milk Products Co-op, 90 Wis. 2d at 800.  Respondents certainly have a substantial interest in protecting the health and safety of Dane County residents.  Petitioners also have substantial interests in

---

[3] Secretary Palm ordered "that all public and private K-12 schools 'shall remain closed' for the remainder of the year."  Wis. Legislature v. Palm, 2020 WI 42, ¶7, 391 Wis. 2d 497, 942 N.W.2d 900.

Page 5
September 10, 2020
Nos. 2020AP1419-OA    James v. Heinrich
     2020AP1420-OA    Wis. Council of Religious and Indep. Schools, et al. v. Heinrich, et al.
     2020AP1446-OA    St. Ambrose Academy, Inc., et al. v. Parisi, et al.


advancing childhood education and providing students a stable and effective learning environment. It is noteworthy that Petitioners went to great lengths—and expended non-negligible sums—to provide students, teachers, and staff the ability to resume in-person instruction with safety precautions in place. In addition, Petitioner educational institutions and parents voluntarily seek in-person instruction, understanding the health risks associated with doing so. The Order itself is both broad and without apparent precedent. Overriding the choices of parents and schools, who also undoubtedly care about the health and safety of their teachers and families, intrudes upon the freedoms ordinarily retained by the people under our constitutional design. Since it appears the Order does not rest on a sound legal basis, a consideration of the equities leads us to conclude a temporary injunction is appropriate.[4]

Petitioners having satisfied the requisite standards, we temporarily enjoin those provisions of Section 4(d) of Emergency Order #9 which purport to prohibit schools throughout Dane County from providing in-person instruction to students and enjoin enforcement thereof.

IT IS FURTHER ORDERED that the parties will be notified in due course of the scheduling of oral argument.

REBECCA GRASSL BRADLEY, J. *(concurring).* Justice Dallet decries the court's "interfere[nce] with a local health officer's ability to make difficult, health-based decisions pursuant to her statutory authority." Local health officers have no statutory authority to impose the order Dane County's health officer made. In this case, Dane County's local health officer invoked a statute according her certain powers as a basis for entering an order the legislature (and, more importantly, the people of Dane County) never authorized her to make. Justice Dallet goes on to lament the court "not even allow[ing] a local circuit court judge to resolve a local dispute." Of course, unlike the court's earlier decision to preclude every circuit court judge in the state from conducting any jury trials until the court allowed jury trials to proceed, this court's decision to take original jurisdiction in this matter did not interfere with any pending circuit court proceeding. No action challenging the local health officer's order was filed in any circuit court in Dane County.

_____

[4]This court has at times also noted that "[t]emporary injunctions are to be issued only when necessary to preserve the status quo." Werner, 80 Wis. 2d at 520. A temporary injunction should "neither give . . . new rights nor alter[ ] the positions of the parties." Shearer v. Congdon, 25 Wis. 2d 663, 668, 131 N.W.2d 377 (1964). This temporary injunction preserves the status quo. When Respondents issued Emergency Order #9 on Friday, August 21, 2020, Petitioners had either already begun school or had conducted months-long preparations to begin school in the days following—with several set to begin the school year on Monday, August 24. That status quo will be preserved only by issuing a temporary injunction. See Shearer, 25 Wis. 2d at 667–68 (upholding a temporary injunction enjoining ongoing blockage of a road over which plaintiffs sought a prescriptive easement).

Page 6
September 10, 2020
Nos. 2020AP1419-OA    James v. Heinrich
     2020AP1420-OA    Wis. Council of Religious and Indep. Schools, et al. v. Heinrich, et al.
     2020AP1446-OA    St. Ambrose Academy, Inc., et al. v. Parisi, et al.

This court removed nothing from any circuit court but instead exercises its constitutional authority to decide a case presenting significant issues of statewide importance.[5] The court acts well within its constitutional authority, and rightly so.[6] This is exactly the type of case the people of Wisconsin elected us to decide. Declining to hear the case would amount to an abdication of the court's institutional responsibilities constitutionally conferred on the state's highest court.[7]

REBECCA FRANK DALLET, J. *(dissenting).* Throughout the COVID-19 pandemic, certain members of this court have repeated the mantra of local control: that we should take care not to "usurp" local officials' ability to control the spread of COVID-19 due to the virus's unique impact on each locality. See, e.g., In Re the Matter of the Extension of Orders and Interim Rule Concerning Continuation of Jury Trials, Suspension of Statutory Deadlines for Non-Criminal Jury Trials, and Remote Hearings During the Covid-19 Pandemic (S. Ct. Order issued May 22, 2020) (Ziegler and Hagedorn, JJ., concurring) ("This order moves us in the direction of returning to local

---

[5] See Petition of Heil, 230 Wis. 428, 284 N.W. 42, 50 (1938) (concluding this court has exclusive jurisdiction when "the questions presented are of such importance as under the circumstances to call for [a] speedy and authoritative determination by this court in the first instance").

[6] See State ex rel. Ozanne v. Fitzgerald, 2011 WI 43, ¶98, 334 Wis. 2d 70, 798 N.W.2d 436, (Abrahamson, C.J., dissenting) ("The concept of original jurisdiction allows cases involving matters of great public importance to be commenced in the supreme court in the first instance." (quoted sources omitted)).

[7] See Wis. Const. art. VII, § 3(2) (conferring jurisdiction on the supreme court to hear "original actions and proceedings"); Wis. S. Ct. IOP III (Sept. 13, 2019) ("principal criterion" for review is "whether the matter . . . trigger[s] the institutional responsibilities of the Supreme Court"); Wisconsin Small Businesses United, Inc. v. Brennan, 2020 WI 69, ¶¶43-45, 69, 393 Wis. 2d 308, 335, 946 N.W.2d 101 (Rebecca Grassl Bradley, J., dissenting) (recognizing the supreme court's institutional responsibility to decide "a significant issue of statewide importance"); SXR Zignego v. Wis. Elec. Comm'n, 2020AP123-W (S. Ct. Order issued June 1, 2020 (Rebecca Grassl Bradley, J., dissenting)) ("It is the duty of Wisconsin's highest court to decide cases presenting novel issues of statewide significance."; recognizing this court's failure to do so is an abdication of its responsibility); Ozanne, 334 Wis. 2d 70, ¶20 (Prosser, J., concurring) ("Delaying the inevitable [by waiting for traditional review by a lower court] would be an abdication of judicial responsibility; it would not advance the public interest.").

20

Page 7
September 10, 2020
Nos. 2020AP1419-OA   James v. Heinrich
     2020AP1420-OA   Wis. Council of Religious and Indep. Schools, et al. v. Heinrich, et al.
     2020AP1446-OA   St. Ambrose Academy, Inc., et al. v. Parisi, et al.

control. . . . We would prefer the order provide even more flexibility to determine the safety procedures that are best in those counties.").[8]

But today, those same justices interfere with a local health officer's ability to make difficult, health-based decisions pursuant to her statutory authority. In fact, by assuming original jurisdiction over this action, the majority, contrary to prior exhortations, will not even allow a local circuit court judge to resolve a local dispute over the validity of a local public health ordinance. Id. (Rebecca Grassl Bradley, J., dissenting) ("I would . . . leave the manner of conducting circuit court proceedings to the circuit court judges, who at this point have had two months to evaluate when and how they may safely conduct jury trials and other proceedings, in consultation with leaders and stakeholders in their respective counties.").

The majority achieves its abrupt about-face by contorting our longstanding original-action and injunctive-relief jurisprudence. But worse than flouting the wisdom of that precedent, the majority's impulsive exercise of both our original jurisdiction and equitable authority promotes a type of forum shopping that undermines our legitimacy as a neutral, apolitical arbiter and signals to lower courts that this court does not trust their ability to fairly apply the law. I must dissent from this misguided exercise of our authority.

The Wisconsin Constitution broadly confers on the state's circuit courts "original jurisdiction in all matters civil and criminal within this state"; it also grants this court the power to "hear original actions and proceedings." Wis. Const. art. VII, §§ 3(2), 8. But this court's grant is finite. Two principles guide us on when to constitutionally commandeer circuit courts' original jurisdiction——and more importantly, when not to do so.

First, this court has continually recognized that the "true spirit and order of the constitutional grant of jurisdiction" demands that municipal undertakings ordinarily be left to the circuit court——even those presenting "questions publici juris." Attorney General v. City of Eau Claire, 37 Wis. 400, 445-46 (1875). This court thus "limits its exercise of original jurisdiction to exceptional cases in which a judgment by the court significantly affects the community at large." State ex rel. Two Unnamed Petitioners v. Peterson, 2015 WI 85, ¶38 n.15, 363 Wis. 2d 1, 866 N.W.2d 165 (quoting Wis. Prof'l Police Ass'n, Inc. v. Lightbourn, 2001 WI 59, ¶4, 243 Wis. 2d 512, 627 N.W.2d 807).

Second, this court should not take original jurisdiction over actions presenting questions of disputed fact for which the circuit court is better equipped to resolve. See In re Exercise of Original

---

[8] See also Oral Argument at 1:01:52-1:02:20, Wisconsin Legislature v. Palm, 2020 WI 42, 391 Wis. 2d 497, 942 N.W.2d 900 (No. 2020AP765-OA), https://wiseye.org/2020/05/05/wisconsin-supreme-court-oral-argument-wisconsin-legislature-v-andrea-palm/.

Page 8
September 10, 2020
Nos. 2020AP1419-OA    James v. Heinrich
    2020AP1420-OA    Wis. Council of Religious and Indep. Schools, et al. v. Heinrich, et al.
    2020AP1446-OA    St. Ambrose Academy, Inc., et al. v. Parisi, et al.


Jurisdiction of Supreme Court, 201 Wis. 123, 128, 229 N.W. 643 (1930) ("This court will, with the greatest reluctance, grant leave for the exercise of its original jurisdiction . . . , especially where questions of fact are involved." (emphasis added)).  Together, these two principles instruct us to reserve our original jurisdiction for rare cases that involve purely legal questions of statewide concern that, because of some exigency, cannot satisfactorily proceed through the traditional legal process.  The petitions before us do not fit that rubric.

The three petitions level several fact-intensive challenges against a local public-health officer's order designed to slow the spread of a novel and highly communicable virus.  In order to impart statewide import to their claims, Petitioners characterize Emergency Order #9 as having "closed" schools, in violation of a local health officer's statutory authority.  Yet Petitioners acknowledge two things that undercut their characterization.  First, they recognize that Emergency Order #9 is an outlier in the state, affecting only Dane County.  Second, they concede that schools are open for many purposes, including in-person instruction for students in kindergarten through the second grade, one-on-one special education services, food distribution, unregulated youth programs, licensed-exempt public school programs, low-risk sports, and religious services and practice.

Ultimately, Petitioners (and several amici) dispute what measures are "reasonable and necessary" pursuant to Wis. Stat. § 252.03(2) to prevent the spread of COVID-19 throughout Dane County, and whether these measures are narrowly tailored in light of Petitioners' allegation that Emergency Order #9 infringes on their constitutional rights to freely exercise their religion and to control their children's "upbringing and education."  Resolution of these claims turns on facts that are not only adamantly disputed, but unique to Dane County, such as infection rates, community-spread levels, and the County's specific efforts to contain COVID-19.  The plethora of unresolved factual questions, all of which are integral to resolving these claims, is aptly illustrated by Petitioners' and amici's multi-volume appendices detailing Petitioner Schools' plans for opening, the communications schools sent to parents, the Petitioner Parents' belief that in-person secular instruction is fundamental to their religious exercise, and various scientific studies.  This court is not a fact-finding court.  "The circuit court is much better equipped" than this court to develop and resolve these factual questions.  See In re Exercise of Original Jurisdiction, 201 Wis. at 128.

Given the numerous, unresolved factual questions and the purely local nature of this dispute, I conclude that Petitioners' challenges squarely belong in a circuit court, before the local judges elected by the citizens of that locality.  The majority's decision to the contrary ignores our precedent, promotes forum shopping, and sends a message that this court believes that local judges cannot properly interpret or apply the law.

The majority similarly casts aside decades of precedent that imposes important limitations on a court's issuance of injunctive relief.  See Werner v. A. L. Grootemaat & Sons, Inc., 80 Wis. 2d 513, 520, 259 N.W.2d 310 (1977) ("[I]njunctions, whether temporary or permanent, are not to be issued lightly."); see also Fromm & Sichel, Inc. v. Ray's Brookfield, Inc., 33 Wis. 2d 98,

22

Page 9
September 10, 2020
Nos. 2020AP1419-OA  James v. Heinrich
   2020AP1420-OA  Wis. Council of Religious and Indep. Schools, et al. v. Heinrich, et al.
   2020AP1446-OA  St. Ambrose Academy, Inc., et al. v. Parisi, et al.


103, 146 N.W.2d 447 (1966); Bartell Broads., Inc. v. Milwaukee Broad. Co., 13 Wis. 2d 165, 171, 108 N.W.2d 129 (1961). Petitioners' burden on a motion for an injunction is to prove four elements: (1) a reasonable probability of success on the merits; (2) a lack of an adequate remedy at law; (3) that they will suffer irreparable harm without an injunction; and (4) that a balancing of the equities favors issuing the injunction. See, e.g., Pure Milk Products Coop. v. Nat'l Farmers Org., 90 Wis. 2d 781, 800, 280 N.W.2d 691 (1979); Werner, 80 Wis. 2d at 520. Petitioners here fail to meet their burden.

At this stage, Petitioners have not shown a reasonable probability of success on the merits. Petitioners claim that a local health officer has no authority pursuant to Wis. Stat. § 252.03(2) to "close schools" because that power belongs exclusively to state officials under § 252.02(3). As discussed above, schools, as institutions, are not "closed"; Emergency Order #9 prohibits only in-person instruction for certain students. And, despite the textual differences between §§ 252.02(3) and 252.03(2), it is reasonable to read the latter as granting a local health officer the authority to prevent in-person instruction under her power to "do what is reasonable and necessary for the prevention and suppression of disease" and to "forbid public gatherings when deemed necessary to control outbreaks or epidemics." In light of these competing statutory interpretations, Petitioners' claims are, at best, "unsettled," making an injunction inappropriate. See Akin v. Kewaskum Cmty. Sch. Joint Sch. Dist., 64 Wis. 2d 154, 159-60, 218 N.W.2d 494 (1974).[9]

Petitioners likewise fail to demonstrate that they have a reasonable probability of success on their constitutional claims. Emergency Order #9 does not favor secular activities over religious ones. Indeed, it does the opposite: it specifically exempts religious exercise from its restrictions on in-person gatherings. As for parents' rights to direct the education of their children, no Wisconsin court has ever recognized the right to in-person instruction in all circumstances. See id. (noting that an injunction should not issue when the right in question is not "established"). All of Petitioners' claims turn on factual questions about whether Emergency Order #9 is necessary, reasonable, and tailored to combat the ongoing COVID-19 pandemic. Those questions require further factual development in the circuit court before the success of Petitioners' claims may be determined with any reasonable degree of accuracy.

---

[9] As the majority's analysis asserts, if local health officers lack the power to "close" schools, that is because there is another entity with the authority to close them: DHS. The majority correctly points out that DHS has the explicit statutory authority to close schools under Wis. Stat. § 252.02(3). According to this court's reasoning in Palm, 391 Wis. 2d 497, DHS has the authority to issue a local order to close schools to control the spread of COVID-19. Id., ¶4 (explaining that DHS is not "without any power to act in the face of this pandemic"); id., ¶¶3 n.6, 58 n.21 (noting that the majority opinion "does not apply" to DHS's order to close schools); see also id., ¶229 (Hagedorn, J., dissenting) (noting that, per the Palm majority's reasoning, DHS could "act locally without going through the rulemaking process").

23

Page 10
September 10, 2020
Nos. 2020AP1419-OA    James v. Heinrich
       2020AP1420-OA    Wis. Council of Religious and Indep. Schools, et al. v. Heinrich, et al.
       2020AP1446-OA    St. Ambrose Academy, Inc., et al. v. Parisi, et al.

But even setting aside the perceived merits, Petitioners fail to provide any evidence that irreparable harm is caused to children or parents by incrementally transitioning third through twelfth graders to in-person instruction as the number of infections in the community reaches a safe threshold. The majority claims that Petitioners have shown such harm while, in the same breath, noting that Petitioners have claimed only that remote instruction is "less than ideal." Everything about the pandemic is less than ideal but inconvenience does not rise to the level of an irreparable harm that this court must remedy.

On the other hand, granting an injunction may cause irreparable harm in the form of risk of severe illness and death. Students gathered together may spread COVID-19 to school staff, each other, and other community members with whom they have contact. The majority asserts that Petitioners undertake that risk "voluntarily . . . , understanding the health risks associated with doing so." Petitioners, and the majority, fail to understand that we are all in this together; voluntarily sending children to school may put others in the community at risk involuntarily. See Bostco LLC v. Milwaukee Metro. Sewage Dist., 2013 WI 78, ¶253, 250 Wis. 2d 554, 835 N.W.2d 160 (Abrahamson, J., dissenting) (if granting an injunction harms an "important public interest," then there is a "compelling" reason to deny it) (quoting City of Harrisonville v. W.S. Dickey Clay Mfg. Co., 289 U.S. 334, 338 (1933)). That risk tips the balancing of the equities sharply away from Petitioners.

For the foregoing reasons, I respectfully dissent.

I am authorized to state that Justices ANN WALSH BRADLEY and JILL J. KAROFSKY join this dissent.

---

Sheila T. Reiff
Clerk of Supreme Court

Address list continued:

Richard M. Esenberg
Anthony LoCoco
Elisabeth H. Sobic
Lucas Thomas Vebber
Wisconsin Institute for Law & Liberty
330 East Kilbourn Avenue, Suite 725
Milwaukee, WI 53202-3141

Ryan J. Owens
Political Science Professor
University of Wisconsin-Madison
214 North Hall,
1050 Bascom Mall
Madison, WI 53706

Page 11
September 10, 2020
Nos. 2020AP1419-OA   James v. Heinrich
    2020AP1420-OA   Wis. Council of Religious and Indep. Schools, et al. v. Heinrich, et al.
    2020AP1446-OA   St. Ambrose Academy, Inc., et al. v. Parisi, et al.


Daniel R. Suhr
Liberty Justice Center
Suite 1500
190 LaSalle St.
Chicago, IL 60603

Kevin M. LeRoy
Misha Tseytlin
Troutman Pepper Hamilton Sanders LLP
227 W. Monroe St.
Chicago, IL 60606

Erick G. Kaardal
Mohrman, Kaardal & Erickson, P.A.
150 Fifth Street S., Suite 3100
Minneapolis, MN 55402

Andrew M. Bath
Thomas More Society
309 W. Washington Street, Ste. 1250
Chicago, IL 60601